Jennifer Adams (Cal. Bar No. 319347)
Shashank Upadhye (*pro hac vice*)
Joseph E. Cwik (*pro hac vice*)
Yixin H. Tang (*pro hac vice*)
Samuel J. Ruggio (*pro hac vice*)
AMIN TALATI UPADHYE, LLP
100 S. Wacker Dr., Suite 2000
Chicago, IL 60606
Tel: (312) 466-1033
Email: chenpatents@amintalati.com

Mark B. Brueggemann
Clinton & Clinton
100 Oceangate Boulevard
Suite 1400
Long Beach, California 90802
Email: mbb@clintonlaw.com

*Attorneys for Plaintiff*
*DEGUI CHEN, Ph.D.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEGUI CHEN, Ph.D., an individual,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL E. JUNG, Ph.D., an individual and CHARLES L. SAWYERS, M.D., an individual,<br><br>Defendants. | Case No.  2:18-cv-02015-R-KS<br><br>**PLAINTIFF'S OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  February 19, 2019<br>Time: 10:00 a.m.<br>Courtroom:  880 (8th Floor)<br>255 East Temple St.,<br>Los Angeles, CA 90012<br><br>Complaint Filed:   March 12, 2018<br>Trial Date:   March 5, 2019 |

**PLAINTIFF'S OPPOSITION TO THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

1

## <u>TABLE OF CONTENTS</u>

I.      Introduction ................................................... 1

II.     Legal Standards ............................................. 3

III.    Argument .................................................... 4

        A.   Dr. Chen is an Inventor Even Under Defendants' Overly
             Restrictive Characterization of Inventive Contribution ........ 6

        B.   Several Other Bases Not Addressed By Defendants Exist to Add
             Dr. Chen as an Inventor ................................ 10

        C.   The "RD" Series and "A" Series Are Not Separate Projects ........ 15

        D.   Defendants' Procedural Deficiency Argument Also Fails ........ 17

IV.     Conclusion ................................................. 21

PLAINTIFF'S OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

## TABLE OF AUTHORITIES

2

<u>**C**ASES</u>

3

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ....................................................................................3, 5

4

5

*Bonilla v. San Diego*,
 1993 U.S. App. LEXIS 10383 (9th Cir. 1993).................................................4

6

*Checkpoint Sys. v. All-Tag Sec. S.A.*,
 412 F.3d 1331, 2005 U.S. App. LEXIS 11752 (Fed. Cir. 2005) .....................4

7

8

*Ethicon, Inc. v. United States Surgical Corp.*,
 135 F.3d 1456 (Fed. Cir. 1998) .......................................................................7

9

*Falana v. Kent State Univ.*,
 669 F.3d 1349 (Fed. Cir. 2012) .....................................................................14

10

11

*Fina Oil & Chem. Co. v. Ewen*,
 123 F.3d 1466 (Fed. Cir. 1997) .......................................................................4

12

13

*First Natl. Bank of Ariz. V. Cities Service Co.*,
 391 U.S. 253 (1968) .........................................................................................4

14

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
 383 F.3d 1352 (Fed. Cir. 2004) .......................................................................4

15

16

*Institut Pasteur v. Simon*,
 384 F. Supp. 2d 802 (E.D. Pa. 2005)...............................................................4

17

18

*Perez v. Vitas Healthcare Corp.*,
 739 F. App'x 405 (9th Cir. 2018)...................................................................20

19

*Trishan Air, Inc. v. Feds. Ins. Co.*,
 635 F.3d 422 (9th Cir. 2011)..........................................................................20

20

21

*Wasco Prods., Inc. v. Southwall Techs., Inc.*
 435 F.3d 989 (9th Cir. 2006) ..........................................................................20

22

<u>**R**ULES</u>

23

Fed. R. Civ. P. 56(a) ...............................................................................................5

24

25

26

27

28

## I.     INTRODUCTION

Dr. Degui Chen was the central figure in the research project at UCLA that resulted in not one, but two, FDA-approved prostate cancer drugs that could treat the previously untreatable "hormone refractory" prostate cancer, which is the type of prostate cancer that would resist all drugs available before Dr. Chen's invention. Dr. Chen is a co-first author on the ground-breaking 2004 Nature Medicine paper that elucidated the underlying molecular mechanism for hormone refractory prostate cancer.  He was involved from the very beginning of the UCLA project to find a cure for this pernicious disease, and he even gave the project its name, "Rational Design." According to a colleague, he was "definitely" the project leader. Dr. Chen spent six months developing the biological assays that enabled screening of compounds to find the best candidates for cancer treatment. Dr. Chen was involved in the design and synthesis of the second-generation "A-series compounds" that would lead to the second of the two drugs, Erleada® (apalutamide, or "A52" in this case). Dr. Chen personally conducted testing to show that the "A-series compounds" idea would work, and then, right before he left UCLA, he identified the best compound (RD162) that could be used as the starting point for making an A-series compound. The "A52" compound, which is now marketed as Erleada, was based on RD162, and a direct result of Dr. Chen's work. The patents in dispute in this case cover both A52 and an earlier, related, and also important compound referred to as "A51."

Soon after Dr. Chen left UCLA in late 2005, however, an erstwhile colleague, Dr. Ouk, with whom Dr. Chen had worked closely on the project, came up with several evolving and conflicting versions of an "A51 story" that he said recounted how the first A-series compound, A51, was conceived, synthesized and tested. Dr. Ouk's stories would write Dr. Chen out of the A-series invention process. The evidence in this case, both in the context of this Motion and at trial, will show that Dr. Ouk lied. When two professors at UCLA who were involved in

the project, who are also the Defendants in this case, Dr. Jung and Dr. Sawyers, learned about A51 for the first time from Dr. Ouk's stories, they also claimed that they were inventors of the A-series compounds. In reality, as the evidence will show, Dr. Jung, an organic chemist, did not even know what the chemical structures of A51 and A52 were until Dr. Ouk told him. After Dr. Ouk left UCLA at the end of 2005, Dr. Jung could not manage to synthesize A52 without calling Dr. Ouk back in for help. Dr. Sawyers, on the other hand, presented himself as an expert witness in this case to discuss Dr. Chen's biological activity assays that were essential for the invention. However, his deposition testimony shows that he did not know the details of the assays.

Defendants try their best to minimize Dr. Chen's leadership, intellectual input, innovative assay development, and hard work that led to the invention of the A-series compounds. Defendants present a number of "facts" that are, at best, contested factual issues that require a trial to resolve. Even credibility assessment of witnesses may be required, which cannot be part of a summary judgment motion. Dozens of Defendants' key "facts" are in reality contested. Forty-eight items of key facts are contested, to be exact. When presenting "facts," Defendants rely heavily on their own deposition testimonies, as well as the testimonies of Dr. Ouk, for support. However, these testimonies are often contradictory on key issues. Different witnesses (especially Dr. Jung and Dr. Ouk) contradicted each other. The same witness would give conflicting statements over time. For example, Dr. Ouk testified at a deposition in 2012 that Dr. Jung did not conceive the A-series compounds. In 2013, Dr. Ouk approved a letter drafted by an attorney representing *both* him and Dr. Chen that states, unequivocally, that Dr. Chen and Dr. Ouk were the true inventors of the A51/A52 patents. In contrast to the testimonial evidence Defendants proffered for their Motion, when Plaintiff Dr. Chen disputes these "facts," he cites for support mainly documents, especially documents that were generated close to the time of the events described therein.

One tactic Defendants used to minimize Dr. Chen's involvement and contribution regarding the A-series invention is to argue for a complete separation between the invention process that led to the first hormone refractory prostate cancer drug, a compound called "RD162-prime," and the process that led to A52/Erleada. The argument is that, although Dr. Chen was an inventor on the "RD-series" patents, he did not do much on the A-series compounds. In reality, there was only *one* project at UCLA aimed at finding a drug to treat hormone refractory prostate cancer. There had never been two separate projects delineated as "RD" and "A" series at UCLA. More than 170 so-called "RD" compounds were made and tested, resulting in the identification of RD162 as the best candidate. RD162 was then further modified in ways that did not change its good activity and pharmacokinetic properties, to generate A52 (Erleada). All this work was done together, in the same labs, by the same people, at the same time.

Given the large quantity of disputed facts and the conflicting testimonies by the witnesses for the defense, Defendants' Motion for Summary Judgment is meritless and should not have been brought—especially when the trial is scheduled to start only five weeks from now. The Motion should be denied.

## II.   LEGAL STANDARDS

Summary judgment is to be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he issue of material fact required by Rule 56[(a)] to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing version of the truth at trial." *Id.* at 248-249 (quoting

*First Natl. Bank of Ariz. V. Cities Service Co.*, 391 U.S. 253 (1968)).

On summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Consequently, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are for the trier of fact, and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

This hurdle is not a high one for a nonmovant to clear. Indeed, even a situation where just the testimony of a plaintiff, corroborated only in part by one other witness and apparently no documents, has been found sufficient to survive summary judgment in this Circuit. *Bonilla v. San Diego*, 1993 U.S. App. LEXIS 10383 (9th Cir. 1993). As Defendants noted in their brief, "circumstantial evidence of an independent nature or oral testimony from someone other than the alleged inventor may [provide sufficient corroboration]." *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1382 (Fed. Cir. 2004).

## III.   ARGUMENT

> [R]esolving summary judgment motions concerning claims of inventorship tends to be a more complex process, as the inquiry is necessarily very fact-intensive. As the Federal Circuit has noted, "the determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997). Dueling experts and competing characterizations of alleged inventive contributions often tend to present situations inappropriate for resolution by summary judgment. *See, e.g.*, *Checkpoint Sys. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 2005 U.S. App. LEXIS 11752, at *15-*18 (Fed. Cir. 2005).

*Institut Pasteur v. Simon*, 384 F. Supp. 2d 802, 804 (E.D. Pa. 2005).  Here, the movants list eight-two separate "uncontested" facts (D.I. 70-2), but Plaintiff

contests forty-eight of them. (*See* Plaintiff's Statement of Contested Facts, filed concurrently with this Opposition). Indeed, precious few material facts are *not* contested, making this case particularly ill-suited for summary judgment.

Defendants' Motion rely heavily on testimonies from their witnesses, several of whom have testified inconsistently over time or actually contradict *one another*. (*See, e.g.*, Plaintiff's Statement of Contested Facts, at ¶¶ 10-18, 22, 30-32, 38, 42, 47). For twenty-one of the forty-eight disputed facts identified by Plaintiff, Defendants solely relied on testimonies of either one or both of the defendants, their expert witness Dr. Winkler, or nonparty witness Dr. Ouk who is represented by Defendants' counsel in this case, for support.  Defendants proffered no documents to support these twenty-one Statements, and Dr. Chen disputes nineteen of them with documentary evidence.[1] For example, Defendants' Statement 49, that "Dr. Ouk testified that he cannot confirm that Dr. Chen actually tested A51," is supported by a single passage from Dr. Ouk's 2018 deposition testimony. (D.I. 70-2, at 15, ¶ 49). Dr. Chen disputes this "fact," citing for support a June 22, 2005 email from Dr. Ouk indicating otherwise, an October 27, 2005 "confession letter"[2] by Dr. Ouk stating exactly the opposite, as well as Dr. Chen's own deposition testimony, accepted as true for this motion. *Anderson*, 477 U.S. at 255. In contrast to Defendants' testimony-heavy "support," Dr. Chen's claim of inventorship is supported not only by his testimony, but numerous documents generated contemporaneously with the invention or close to the events.

---

[1] These nineteen Statements by Defendants are: ¶¶ 1-3, 5-7, 13, 16-20, 25, 45, 49, 65, 80-82 (D.I. 70-2). Dr. Chen contested these "facts" in his Statement of Contested Facts, at ¶¶ 1-3, 5-7, 12, 14-18, 22, 30, 32, 40, 46-48, citing for support documents as well as testimonies (including those from the defendants, Dr. Ouk, and other nonparty witnesses, in addition to the deposition testimony of Dr. Chen).

[2] Dr. Ouk's October and November 2005 letters setting forth various versions of his "A51 Story" were called "confession letters" by Dr. Sawyers. (Ruggio Decl. **Ex. 26,** Sawyers 12/11/2018 Dep. Tr., at 53:13-17).

Both sides also have filed expert declarations for support, but the two chemistry experts do not agree on how the invention process for the patents-in-suit occurred, and what Professor Chen's contribution was.

The Motion should also be denied because Defendants delayed filing this motion until the very last moment, with a hearing date two weeks *after* the Final Pre-trial Conference was scheduled to be held,[3] and mere *two weeks* before the trial is scheduled to start.  It would plainly be a waste of judicial resources to consider this meritless motion involving a complicated recitation of interwoven facts, the assessment of the import and relevance of many of which calls for credibility determinations that can only be made at trial.

### A.   Dr. Chen is an Inventor Even Under Defendants' Overly Restrictive Characterization of Inventive Contribution

Defendants try to limit Dr. Chen's involvement in the A51/A52 invention process to his testing of A51. (D.I. 69, at 12-17).  They dispute that the testing actually occurred or that the results were communicated to others. (*Id.* at 16-17).  Furthermore, Defendants argue that any work done on the RD-series compounds could not be basis for inventorship on the A51/A52 patents. (*Id.* at 22-25).

Defendants' narrow view of what the A-series invention involved represents a strawman.  Dr. Chen's contributions went far beyond the testing of A51. (Bihovsky Decl., at ¶¶ 33-58).  Dr. Chen discussed and recommended to Dr. Ouk pyridine substitution of the RD-series compounds, developed non-public, intricate bioassays that enabled the efficient and reliable testing of compounds to identify the best RD-series compounds as starting points for pyridine substitution, skillfully tested numerous compounds using the assays he developed and analyzed the testing results, which resulted in the identification of RD37 and RD162 as the best starting

---

[3] The Final Pre-Trial Conference was scheduled for February 4, 2019, but has been rescheduled to February 19, 2019 by the Court's Order issued on January 28, 2019. (D.I. 89).

compounds for modification (resulting in the synthesis of A51 and A52, respectively), and, last but not least, tested A51 in February, 2005, which was, according to Dr. Ouk's story in November, 2005, necessary to validate the pyridine strategy and move the project forward. (Ruggio Decl., **Ex. 5**, at UC-CVJ00000142 (project "on hold" for eight months when Dr. Chen's A51 testing results were not known to all involved)).  Any one of these contributions is sufficient to confer inventorship on Dr. Chen, and the Court need only find a significant contribution to a single claim on each of the A51/A52 patents to find that Dr. Chen is an inventor. *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).

Even the strawman constructed by Defendants should fail on summary judgment, because Dr. Chen's testing of A51 is in fact one basis to find that Dr. Chen is an inventor.  **First,** even without the favorable inferences appropriate for a summary judgment motion, the evidence would establish that Dr. Chen not only tested A51, but also effectively communicated the testing results to Dr. Ouk in early 2005.  A June 22, 2005 email from Dr. Ouk to David Hung of Medivation establishes that A51 had been tested, and Dr. Ouk knew by then that the results were "encouraging." (*See* detailed analysis of this email in Bihovsky Decl., at ¶¶ 59-82).  In that email, Dr. Ouk stated that he had made a single compound of a new scaffold "inspired by the RD series," and the compound "was tested" and "the activity is encouraging." (Ruggio Decl., **Ex 17**, at UC-CVJ00009938).  The only chemical compound that fit this description at the time of this email was A51, and the only person who could have tested for that activity, and given Dr. Ouk the information that "the activity is encouraging," is Dr. Chen. (Bihovsky Decl., at ¶¶ 75-77).  There is no evidence to the contrary.[4]  This email, viewed in connection

---

[4] During discovery, Defendants' expert witness, Dr. Winkler, came up with an outlandish theory that Dr. Ouk could have been discussing in this email a "pyrazolone" compound designated as RD144, and Dr. Chen could have renamed this RD144 compound "RD37*" during his testing. This speculation has no support whatsoever from the evidence, and Dr. Bihovsky briefly addressed and refuted it in

7

with other contemporaneously-generated documents, in particular the information on compound synthesis and testing in Dr. Chen's laboratory notebooks, summarized by Dr. Bihovsky in his Declaration, ¶ 75 (Table 1), leads to the conclusion that Dr. Chen did in fact test A51 and communicate the results to Dr. Ouk, who relayed that "the activity is encouraging" in his June 22, 2005 email.[5]

**Second,** the cell culture-based testing of A51 Dr. Chen performed was not publicly known or routine, contrary to Defendants' erroneous characterization. (D.I. 69, at 16). Dr. Chen used three different assays. (Ruggio Decl., **Ex. 15, 16**). Dr. Chen's development of these assays took six months, and included the engineering of specific cell lines, development of the correct growth conditions for the cell cultures used, setting of assay parameters, and the selection of a proper concentration range to test candidate compounds for activity, all of which involved expert skill. (Ruggio Decl., **Ex. 30**, Chen 12/12/2018 Dep. Tr., at 191:23-193:15, 194:10-22, 196:18-22, 197:9-202:22; **Ex. 1**, Chen LNB No. 1); *see also* Bihovsky Decl., at ¶ 10 (a six-month assay development based on a review of Dr. Chen's laboratory notebook, Ex. 1)). The details of the testing were not publicly available at the time. Defendant Dr. Sawyers offered himself as an expert witness in this case and opined that the three assays Dr. Chen used were all previously published in journal articles, but when questioned at deposition, he did not know whether the same cell lines, growth conditions, or passage histories were used, and acknowledged that the concentration range Dr. Chen used to test compounds including A51 was not published. (Ruggio Decl., **Ex. 44**, Sawyers 1/12/2019 Dep.

_____

his Declaration filed concurrently with this brief. (Bihovsky Decl., at ¶¶ 71-72).

[5] Notably, Drs. Ouk, Jung and Sawyers have testified that Dr. Chen did not communicate such positive results, and that he actually told Dr. Ouk and Dr. Jung that the compound was not active. (D.I. 69, at 17). This is but one example of the lack of credibility of Defendants' and Dr. Ouk's self-interested testimony, for which a trial is necessary.

Tr., at 99:15-24, 100:14-101:1, 120:23-121:2, 138:8-139:9, 139:17-140:1, 150:15-151:20, 152:23-153:11, 155:3-156:4, 160:21-161:19, 167:9-21, 169:19-24, 171:18-22, 173:20-23, 177:19-23, 182:21-183:3, 185:20-186:19, 189:17-20, 196:14-197:9, 198:7-12).

**Third,** Dr. Chen's testing of A51 was necessary for the A-series project to go forward. It was not merely confirmatory as Defendants now portray. (D.I. 69, at 15). Before Dr. Chen's testing, no one could have known whether A51 would have good activity, or whether the pyridine substitution strategy would actually work. In Dr. Ouk's November 15, 2005 "A51 story" letter, which Dr. Jung admitted to editing, Dr. Ouk told a version of his story of how Dr. Chen refused to give him the biological activity testing data on A51 in February, 2005, and, as a consequence, "[f]rom February to October 2005, our A51 project was on hold" because he "did not have the data on its biological activity." (Ruggio Decl., **Ex**. **5**, at UC-CVJ00000142). Dr. Ouk also described the situation in early 2005 as, "I urgently needed our new compounds be tested"—and the testing could only be done by Dr. Chen. (*Id.*, at UC-CVJ00000141). These statements directly contradict Defendants' new position that the chemists had things figured out, and had "a very specific, reasonable scientific rationale for [believing] that A51 would show activity and be useful in treating prostate cancer," before it was even tested. (D.I. 69, at 14).

Defendants' expert witness, Dr. Winkler, actually undermines Defendants' position by spending pages upon pages of his Declaration (D.I. 67, at 18-32) trying to demonstrate that "there is a profound difference between . . . the RD-series compounds . . . and the A-series compounds," (*Id.* at ¶ 36), or, put it another way, "[a]lmost all of the physical properties of benzene and pyridine are completely different." (*Id.* at ¶ 41). These opinions would support *Professor Chen's* position that the testing he carried out on A51 was necessary to validate the pyridine substitution approach.

After opining emphatically that benzene and pyridine structures are

1   completely different, Dr. Winkler then opined, without support, that both Dr. Jung

2   and Dr. Ouk overcame these reservations that should have been well known to

3   chemists, and formed "a clear rationale for the invention of the A-series

4   compounds" by a pyridine substitution of the benzene-containing RD compounds.

5   (*Id.* at ¶ 50 (referring to an undated "Chemical Drawings" and quoting November 5,

6   2005 email from Dr. Ouk to Dr. Sawyers)).  There is no indication that Dr. Jung's

7   "Chemical Drawings" Dr. Winkler relied on were actually generated before A51

8   was synthesized. (*See* Plaintiff's Statement of Contested Facts, ¶ 11 (presenting

9   contradictory deposition testimonies by Dr. Jung himself)). Dr. Ouk's "clear

10   rationale" was written down in November, 2005, *nine months* after he had already

11   known from Dr. Chen that A51 had good activity, i.e. the pyridine substitution idea

12   had been shown by actual experimental results to have worked. (*See* discussion on

13   the June 22, 2005 email from Dr. Ouk to David Hung, *supra*). Furthermore, despite

14   the "clear rationale," Dr. Ouk also wrote in November, 2005, that the A-series

15   project was stalled or "on hold" for eight months without the data from Dr. Chen's

16   testing. (Ruggio Decl., **Ex. 5**, at UC-CVJ00000142).

17        For the reasons above, even if the inquiry for the purpose of this motion is

18   narrowed to just Dr. Chen's testing of A51, that contribution alone could lead a

19   reasonable factfinder to conclude that Dr. Chen is entitled to be listed as an inventor

20   on the A51/A52 patents. Therefore, the Motion should be denied.

21        **B.    Several Other Bases Not Addressed By Defendants Exist to Add
22              Dr. Chen as an Inventor**

23        A summary judgment for Defendants is not appropriate even if the Court

24   were to agree with Defendants' position regarding the "publicly known" and

25   "confirmatory" nature of the A51 testing. Dr. Chen's contribution to the A51/A52

26   patents went far beyond the testing of A51. Plaintiff's expert declarant,

27   Dr. Bihovsky, relied primarily on documentary evidence, and set forth a timeline

28

1  showing that Dr. Chen had contributed to the invention of A51/A52 patents in
2  multiple ways. (Bihovsky Decl., at ¶¶ 33, 50-58).

3      **First,** the earliest, dated, document in this case corroborates Dr. Chen's
4  testimony that he participated in and contributed to the decision to make pyridine
5  modification of RD-series compounds and, in particular, to combine a pyridine with
6  the right-side structure of RD37 to make A51. (Ruggio Decl., **Ex. 10**, Oct. 13, 2004
7  email).  Defendants try to misconstrue this October 13, 2004 email as merely
8  indicating "the simple act of purchasing of ingredients," a "purely administrative
9  act." (D.I. 69, at 17-18).  The document carries with it two important pieces of
10  information.  The email was dated to October 13, 2004, which was a month and
11  half after the August 31, 2004 meeting of Dr. Jung, Dr. Ouk, Dr. Chen, and Dr.
12  Sawyers, during which potential or possible modifications of the RD-series
13  compounds were discussed. (*See* Bihovsky Decl., at 11-13 (timeline for 2004)).
14  The timing of events, in addition to Dr. Ouk's 2012 deposition testimony,
15  corroborates Dr. Chen's testimony that the August 31, 2004 meeting did not lead to
16  a conclusion and any immediate action plan to make A-series compounds. Rather,
17  Dr. Ouk and Dr. Chen discussed the project after the meeting, at the "bomb shelter"
18  lunch place as they frequently did, and then came to the conclusion and decision to
19  make A51. (Ruggio Decl., **Ex. 30**, Chen 12/12/2018 Dep. Tr., at 77:22-25, 81:17-
20  83:6, 135:16-22, 136:8-16; **Ex**. **27**,  Ouk 5/14/2012 Dep. Tr., at 24:16 -25:4).

21      The second important piece of information from the October 13, 2004 email
22  is precisely that Dr. Ouk asked Professor Chen, and not Dr. Jung or Dr. Sawyers
23  (for example through the Sawyers lab manager Mr. Wongvipat), to obtain chemical
24  precursors for making A51.  As Dr. Bihovsky pointed out, such a request would be
25  directly to someone who knew its purpose and supported the effort. (Bihovsky
26  Decl., at ¶ 51).

27      Defendants argue arduously that Dr. Chen could not possibly contribute to
28  the pyridine substitution idea, because he "lacks the chemistry expertise to have

1  come up with a nitrogen substitution in the left-hand ring." (D.I. 69, at 20-21; D.I.
2  67 (Winkler Decl.), at ¶¶ 52-60).  Dr. Winkler went so far as to say, "Dr. Chen's
3  ignorance regarding the most rudimentary chemical differences between benzenes
4  and pyridines makes it impossible for me to believe that he played a role in
5  designing A51 and A52, and in recognizing the significance of the introduction of
6  the pyridine ring into these two structures." (D.I. 67, at ¶ 60). However,
7  Dr. Winkler's disbelief is illogical. "Designing A51 and A52" and "recognizing the
8  significance" are two different things, and one is not required for the other. The
9  "significance" Dr. Winkler discussed was the differences between benzene and
10  pyridine both in terms of structures and the physical properties of the compounds.
11  The "recognizing" of such "significance" would serve to deter chemists from
12  suggesting pyridine substitution more than someone who may not recognize all
13  these differences.  As Dr. Chen's expert declarant, Dr. Bihovsky, pointed out, even
14  today the precise mechanism of action by the A-series compounds was not known.
15  (Bihovsky Decl., at ¶ 85).  In fact, Dr. Jung testified in 2019 that, with respect to
16  how pyridine worked in androgen receptors, "none of us knew how it fit," and
17  "[w]e were making guesses all the way along." (Ruggio Decl., **Ex. 36,** Jung
18  1/4/2019 Dep. Tr., at 42:7-17; 118:9-18).[6] The lack of knowledge did not prevent
19  the A-series invention.
20       Dr. Bihovsky explained why Dr. Chen had sufficient knowledge of pyridine-
21  for-benzene substitution to make such a suggestion and participate in making a

[6] Dr. Jung's 2019 deposition testimony contradicts Dr. Winkler's opinion that, despite their knowledge of all these significant differences between the benzene and pyridine structures, Dr. Jung and Dr. Ouk figured out a "clear rationale" why pyridine substitution in RD-series compounds would be expected to work. (D.I. 67 (Winkler Decl.), at ¶¶ 50, 63-64). The documents Dr. Winkler relied on were either undated or generated a year after the fact and with the benefit of hindsight that the testing on A51 by Dr. Chen had already shown that pyridine substitution worked. It turns out that, according to Dr. Jung's 2019 testimony, the "clear rationale" was actually "guesses all the way along."

decision to synthesize an A-series compound. (Bihovsky Decl., at ¶¶ 83-90).  For example, a reference available in 2004, BMS Salvati, had already disclosed "modulators of nuclear hormone receptor function" that contained alternatively benzene ring structure and pyridine ring structure. (*Id.* at ¶ 86).  Dr. Chen also testified that he knew (correctly or incorrectly, which should not matter for this inquiry) that pyridine and benzene rings are "similar aromatic structures." (*Id.* at ¶ 87).  There is no dispute that a nitrogen atom and a carbon atom (i.e. the difference between a pyridine and a benzene ring) have approximately the same size. (*Id.* at ¶ 84).  Replacing a benzene ring with a pyridine ring is not expected to change the overall shape of the molecule including the spatial arrangement of important side groups attached to the ring. (*Id.* at ¶ 31). This level of understanding possessed by Dr. Chen was sufficient for him to recommend pyridine substitution, especially because he had developed assays to test the resulting modified compounds.  Nobody would have to guess whether pyridine substitution would work; the success or failure of the approach would be shown by empirical testing, and Dr. Chen was the person to do that testing. An inventor does not need to be an expert in all aspects of the invention, or even be completely correct in his reasoning that led to the invention.

**Second,** there is no dispute that Dr. Chen conducted bioassays testing on the RD-series compounds and identified RD37 and RD162 as having good activity, and, in the case of RD162, good pharmacokinetic (PK) properties as well. (*See* D.I. 69, at 22-23).  By July, 2005, Dr. Chen identified RD162 as having "great PK" and having the potential to "be the best of this series," i.e. the best candidate suitable for further modification according to the plan that was already set in motion at that point in time.  (Ruggio Decl., **Ex. 22**).  He communicated his conclusion to both Dr. Jung (presumably through Dr. Ouk) and Dr. Sawyers. (*Id.*).  As Dr. Ouk wrote on October 27, 2005, A52 is nothing more than "combining the idea [of] A51 and RD162." (Ruggio Decl., **Ex. 18**).  Dr. Jung also testified in 2019 that, once "we

already knew that RD162 now was quite good, it would be natural to take the left-hand pyridine piece and put it with RD162." (Ruggio Decl., **Ex. 36**, Jung 1/4/2019 Dep. Tr., at 259:23-260:4). The course for pyridine substitution was already set in July, 2005, and known to all four of these individuals involved. The identification of RD162 by Dr. Chen as having good activity and PK properties was the conception event for A52.

The fact that the same assays may have been used to screen RD compounds and test A-series compounds does not change this analysis. The fact that the U.S. Patent & Trademark Office granted different patents for the RD-series compounds and the A-series compounds does not change this analysis, either. The same method could be applied to distinct inventions, entitling the developer of that method to inventorship on *both* sets of patents. *See Falana v. Kent State Univ.*, 669 F.3d 1349, 1359 (Fed. Cir. 2012). Work that led to a patentable invention could be basis for inventorship on an extension of that first invention, when the extension led to new compounds and more patents. *See id.* As we will discuss in more detail in the next section, there was only one project at UCLA to develop prostate cancer drugs, and the two A-series compounds resulted from a direct extension of the work on the RD-series compounds.

**Third,** the assays Dr. Chen spent six months developing were used to screen as many as 172 RD-series compounds and identify compounds as suitable for development into pharmaceuticals. (Bihovsky Decl., at ¶ 28). These assays were also used for the "proof of concept" testing on A51 by Dr. Chen. As discussed above, Defendants have not offered any evidence, when all justifiable inferences are drawn in the non-movant's favor, to show that these assays were public or routine. To the contrary, Dr. Sawyers admitted in his 2019 deposition that the cell lines and conditions used by Dr. Chen could be different from the assays that were published in earlier journal articles, and the dose range used by Dr. Chen for his work on RD-series compounds and A51 was not disclosed. (Ruggio Decl., **Ex. 44**,

Sawyers 1/12/2019 Dep. Tr., at 99:15-24, 100:14-101:1, 120:23-121:2, 138:8-139:9, 139:17-140:1, 140:7-18, 150:15-151:20, 152:23-153:11, 155:3-156:4, 160:21-161:19, 167:9-21, 169:19-24, 171:18-22, 173:20-23, 177:19-23, 182:21-183:3, 185:20-186:19, 189:17-20, 196:14-197:9, 198:7-12).

    **Finally,** as discussed in the section above, Professor Chen tested A51 in February 2005, and confirmed that the previously unproven strategy and hypothesis of pyridine substitution worked on the RD-series compounds.

## C.   The "RD" Series and "A" Series Are Not Separate Projects

    Rather than addressing Dr. Chen's critical and necessary work for both the RD- and A-series inventions, Defendants want this Court to find that they are separate projects—one involving Dr. Chen and one not. Defendants are wrong. Defendants admit that Dr. Chen is an inventor on the RD-series; there is absolutely no dispute there. The fact is that as many as 172 RD compounds had to be synthesized and screened to find one good drug candidate, RD162, which was later modified to make RD162-Prime (which became the marketed drug Xtandi®). Yet, by contrast, *only two* A-series compounds were ever made at UCLA. (Bihovsky Decl., at ¶ 28). The A-series compounds came from a much more targeted approach, which was an extension of the work on RD-series compounds and relied on the results from Dr. Chen's screening of numerous RD compounds. When RD37 was found to have good biological activities, the corresponding A51 compound was made and tested. Dr. Chen's testing results on A51 showed that the pyridine substitution worked. After that, more RD-series compounds were synthesized and screened, because the team wanted a compound with good PK properties (i.e. the compound could stay in human body long enough to carry out its good activity) in addition to good activity at the androgen receptors. (*See, e.g.*, Ruggio Decl., **Ex. 5**, Ouk Nov. 15, 2005 letter, at UC-CVJ00000141 ("At that time, we had poor preliminary PK data for RD37 . . . .")). As soon as such a compound was found, i.e.

RD162, according to both Dr. Jung and Dr. Ouk, it would be "natural" and "easy" to combine the "idea of A51" and the right-hand side structure of RD162, to arrive at A52. (Ruggio Decl., **Ex. 18**, Ouk's October 27, 2005 First Letter; **Ex. 36**, Jung 1/4/2019 Dep. Tr., at 259:23-260:4; **Ex. 31**, Ouk 5/15/2012 Dep. Tr., at 280:7-24).

As shown by the discussion above, the work on the RD-series and A-series compounds were interwoven and actually inseparable. The RD-series compounds were "rationally designed" but had to be screened one by one to find the best candidates. It was an iterative process to find better and better structures. (Ruggio Decl., **Ex. 36**, Jung 1/4/2019 Dep. Tr., at 45:15 – 46:12). As Dr. Jung testified, "It's hard." (*Id.*). The A-series compounds, a series of two, resulted from a different approach—and this different, more targeted approach, could not have worked without the work on the RD-series compounds. The best right-hand side structures were first identified through the RD-series compound screening, and then, in Dr. Ouk's phrasing in October, 2005, "combined with the idea of A51." Without first knowing the correct structures for the right-hand side of the molecules, there would not have been any "designing," envisioning, or drawings of A51 and A52.

Therefore, the innovative and hard work on the RD compounds took the researchers to the doorstep of the A-series compounds. They could all envision what was on the other side of the door, once a good RD-series compound was identified as the starting point for the pyridine modification. Once Dr. Chen told Dr. Ouk about the good activity of A51, there was not even any uncertainty that laid on the other side of the door. On the other hand, without the screen and testing of many RD compounds, done by Dr. Chen personally up to the point he resigned from UCLA two months after the RD162 compound had been identified as a good candidate, no chemists could envision the correct right-hand side structure to combine with a pyridine, to make a compound that is both active and stable in human body. As Dr. Jung remembered in 2019, "[w]e were making guesses all the way along." (Ruggio Decl., **Ex. 36,** at 42:7-17). Dr. Jung also pointed out that, "even today, all

we have are modeling. We don't have any crystal structures." (*Id.* at 118:9-18). No one had a crystal ball to predict the structure of A52 out of the blue, and further to predict that the proposed compound will have both good activity and good PK properties. What the UCLA researchers did have, however, was Dr. Chen, his bioassays, and his insights.

### D.   Defendants' Procedural Deficiency Argument Also Fails

Toward the end of their motion brief, Defendants argue that Dr. Chen should be precluded from arguing that his involvement on the RD-series compounds, and his specific identification of the RD-compounds that were converted to A51 and A52 using a strategy identified and discussed by Drs. Chen and Ouk, entitles him to be listed as an inventor on the A51/A52 patents. (D.I. 69, at 21-22). Defendants are wrong on the facts and wrong on the law.

Dr. Chen's Complaint included an allegation that he identified RD37 and suggested that it could be a good candidate for modification to A51. (D.I. 1, at ¶¶ 29-30 (Dr. Chen and Dr. Ouk "jointly came to a conclusion to utilize RD37 as the starting point [for pyridine modification].")). This is a description of the A-series compounds invention process, which is, first, to identify a good RD compound through screening, and second, to make a pyridine substitution. This is exactly what Dr. Chen is going to prove at trial, that the innovative and hard work that led to the identification of a good RD compound as "the starting point" for pyridine substitution is part and parcel of the invention process for the corresponding A-series compound. Nothing more need to be included in the initial pleading for Dr. Chen to have the right to prove his contributions to the A51/A52 inventions at trial.

However, Dr. Chen did more to provide ample notices to Defendants what his case theories are. Dr. Chen resigned from UCLA in September of 2005. At the time of filing of the Complaint, Dr. Chen was not aware of the process by which the

remaining researchers at UCLA actually undertook for the synthesis of A52. In particular, the two key documents, which are, one, the July 30, 2005 email chain between Dr. Jung and Dr. Sawyers acknowledging Dr. Chen's contribution in identifying RD162 as potentially the best compound, and, two, Dr. Ouk's explanation that A52 was a combination of "A51 and RD162," were not available to Dr. Chen. (Ruggio Decl., **Ex. 18; Ex. 22**). As soon as sufficient information became available, Dr. Chen timely and fully disclosed the theory which Defendants now wrongly claim is being raised for the first time. For example, Defendants propounded Interrogatory No. 2 to Dr. Chen, which called for a disclosure of "all factual and legal bases for Plaintiff's contention that Plaintiff is a joint inventor of the inventions described in such claims." Dr. Chen responded, with respect to the first claim of the '507 patent:

> **Claim 1** – Plaintiff developed biological assays to identify candidate compounds with good androgen receptor binding and antagonistic effects, potentially suitable to develop into a drug for the treatment of prostate cancer. Plaintiff used these assays successfully to identify drug candidates including RD37 and RD162. Plaintiff participated in the August 2004 meeting to discuss replacing one of the carbon atoms in one of the ring structures to a nitrogen atom, making it a heterocyclic ring. The result of the discussion was a joint decision to pursue this nitrogen substitution at a specific part of the "RD" series compounds, among several suggestions discussed at the meeting. Plaintiff further discussed this strategy of identify RD compounds to modify with the nitrogen substitution with co-inventor, Dr. Ouk, in early October 2004 at a lunch table at the UCLA bomb shelter. Plaintiff identified RD37 as the "Star" compound and drug candidate that should be used as a starting point for making the A series of compounds. Plaintiff obtained the biological test results of RD37 on March 9, 2004 and established that RD37 had a strong therapeutic biological activity for prostate cancer and could be developed into a drug for prostate cancer. Since his original testing of

RD37, he used RD37 as a reference to test most of the RD series of compounds for therapeutic biological activity for prostate cancer including RD48-53 (April 13, 2004), RD48-57 (June 28, 2004), RD54-58 (June 11, 2004), RD59-72 (August 12, 2004), RD73-75 (August 19, 2004), RD76-86 (August 21, 2004), RD87-13 (October 22, 2004), RD108-113 (January 12, 2005), RD114-122 (February 11, 2005), RD123-140 (April 29, 2005), and RD141-157 (June 8, 2005). Plaintiff selected RD37 as a drug candidate for in-depth analysis, including its effect on prostate cancer in mouse and the pharmacokinetic properties. Plaintiff further examined and confirmed the biological activity of A51 (CC1) in direct comparison with RD37 on February 15, 2005, and established that both compounds had similar therapeutic biological activity for prostate cancer.

Plaintiff obtained the biological test results of RD162 on July 18, 2005, establishing that RD162 had a strong therapeutic biological activity for prostate cancer. He obtained pharmacokinetic data showing that RD162 has superb pharmacokinetic profiles before September 9, 2005, when he resigned from UCLA. The results established RD162 as a drug candidate for prostate cancer, and RD162 was another suitable candidate for modification according to the nitrogen substitution strategy jointly decided upon during the August 2004 meeting. A nitrogen substitution (pyridine) analog of RD162, such as A52, could also be used for prostate cancer because the pyridine substitution maintains biological activity of the benzene ring, as indicated by the results that RD37 has comparable biological activities of A51.

(Ruggio Decl., **Ex. 37**, at 5-6). These are exactly the theories Dr. Chen intends to prove at trial. These same theories have also been fully explicated in three separate expert reports by Dr. Bihovsky.

Defendants cite three cases to support their assertion; none are applicable. (D.I. 69, at 21-22). *Wasco Prods.* involved a newly-raised conspiracy to commit

fraud allegation, triggering the "pleading with particularity" requirement under FED. R. CIV. P. 9. Dr. Chen's allegations, on the other hand, require only notice pleading, and Dr. Chen adequately factually pled the material elements of his inventorship claim. *See Wasco Prods., Inc. v. Southwall Techs., Inc.* 435 F.3d 989 (9th Cir. 2006). *Trishan Air* involved an entirely new basis for relief than any raised in the case previously; here, though, Dr. Chen's Complaint already put Defendants on notice that he seeks the relief of correcting the inventorship on the A51/A52 patents, and his selection of RD37 to be converted to A51 was part of his case for inventorship (i.e., his claim to inventorship was not based on just the testing he had done on A51, but also on his involvement in formulating and carrying out the strategy of identifying a good RD compound followed by pyridine substitution). *See Trishan Air, Inc. v. Feds. Ins. Co.,* 635 F.3d 422 (9th Cir. 2011). Defendants were further advised of Dr. Chen's theories in discovery, repeatedly and in detail. Lastly, in *Perez* the plaintiff failed to adequately plead all the elements of the claim she sought to make; again, there is no dispute that Dr. Chen adequately pled a claim for inventorship based both on his work on the RD-series compounds, the conception of A-series compounds, and the testing of A51.  *See Perez v. Vitas Healthcare Corp.*, 739 F. App'x 405 (9th Cir. 2018).

Furthermore, to require Dr. Chen to amend his complaint any time new material is found in discovery would frustrate the purpose of notice pleading and waste this Court's valuable time. For instance, documents and testimony produced from Defendants and nonparty witnesses represented by Defendants' counsel indicated that A52 was developed directly due to Dr. Chen's work and identification of RD162 as the best candidate. This material was not and could not have been in Dr. Chen's possession when he filed his Complaint. Counsel is aware of no authority that requires each and every theory of the same claim to be added to the complaint as they become known throughout discovery; that is precisely what the process of discovery, in particular vehicles such as contention interrogatories

and expert reports, are for. Rather, amendment of a pleading is for new <u>claims</u> or new <u>defenses</u> not previously raised.

## IV.   CONCLUSION

For the reasons set forth above, Dr. Chen respectfully requests that the Court deny the Defendants' Motion for Summary Judgment.

Dated:  January 29, 2019                    Respectfully submitted,


                                            <u>/s/ Samuel J. Ruggio          </u>
                                            Jennifer Adams (Bar No. 319347)
                                            Shashank Upadhye
                                            Joseph E. Cwik
                                            Samuel J. Ruggio

                                            AMIN TALATI UPADHYE LLP
                                            100 S. Wacker Dr., Suite 2000
                                            Chicago, IL 60606
                                            Tel: (312) 466-1033
                                            Email: chenpatents@amintalati.com

                                            Mark B. Brueggemann
                                            Clinton & Clinton
                                            100 Oceangate Boulevard, Suite 1400
                                            Long Beach, CA 90802
                                            Email: mbb@ClintonLaw.com

                                            *Attorneys for Plaintiff*
                                            *Dr. Degui Chen*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2019, a true and correct copy of the foregoing **PLAINTIFF'S OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** is served by ECF and email upon Counsel of Record for Defendants:

Emily Tomoko Kuwahara (SBN 252411)
CROWELL & MORING LLP
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: (213) 622-4750
Facsimile: (213) 622-2690
Email: EKuwahara@crowell.com

Gregory D. Call (SBN 120483)
Gabriel M. Ramsey (SBN 209218)
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827
Email: GCall@crowell.com
          GRamsey@crowell.com

*Attorneys for the Defendants*

Dated: January 29, 2019          By:   /s/ Samuel J. Ruggio
                                       Samuel J. Ruggio

                                       *Attorney for the Plaintiff,*
                                       *Dr. Degui Chen*