Jennifer Adams (Cal. Bar No. 319347)
Shashank Upadhye (*pro hac vice*)
Joseph E. Cwik (*pro hac vice*)
Yixin H. Tang (*pro hac vice*)
Samuel J. Ruggio (*pro hac vice*)
AMIN TALATI UPADHYE, LLP
100 S. Wacker Dr., Suite 2000
Chicago, IL 60606
Tel: (312) 466-1033
Email: chenpatents@amintalati.com

Mark B. Brueggemann
Clinton & Clinton
100 Oceangate Boulevard
Suite 1400
Long Beach, California 90802
Email: mbb@clintonlaw.com

*Attorneys for Plaintiff*
*DEGUI CHEN, Ph.D.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| DEGUI CHEN, Ph.D., an individual,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL E. JUNG, Ph.D., an individual and CHARLES L. SAWYERS, M.D., an individual,<br><br>Defendants. | Case No.  2:18-cv-02015-R-KS<br><br>**PLAINTIFF'S STATEMENT OF CONTESTED FACTS IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  February 19, 2019<br>Time: 10:00 a.m.<br>Courtroom:  880 (8th Floor)<br>    255 East Temple St.,<br>    Los Angeles, CA 90012<br><br>Complaint Filed:    March 12, 2018<br>Trial Date:    March 5, 2019 |

Pursuant to Rule 56-1 of the U.S. District Court for the Central District of California, Plaintiff Dr. Degui Chen, Ph.D. ("Dr. Chen") hereby submits his separate statement of contested facts in opposition to the Defendants' Motion for Summary Judgment.

## I.   SEPARATE STATEMENT OF CONTESTED FACTS

| CONTESTED FACT | EVIDENCE |
| --- | --- |
| 1. "1.  In the summer of 2004, two labs at the University of California Los Angeles ("UCLA") developed chemical compounds aimed at treating prostate cancer."  (Defendants' Statement of Uncontroverted Facts ("Def's SUF"), at ¶ 1).<br><br>In fact, first, the aim of the research project at UCLA (hereinafter "Prostate Cancer Project") was not to treat prostate cancer in general, but was more focused.  The aim was to find treatments for a particularly pernicious and previously untreatable form of prostate cancer called "castration resistant" or "hormone refractory" prostate cancer.  Dr. Chen's work (along with Dr. Sawyers' group) laid the foundation of this more focused research.  A 2004 article published by Dr. Chen and others was a "big deal" and pointed out the direction for the entire Prostate Cancer Project.<br><br>Second, to the extent Defendants are suggesting that the "two labs at UCLA" who worked on the Prostate Cancer Project were the Sawyers lab and the Jung lab, that assertion is incorrect.  In the summer of 2004, Dr. Chen had been promoted to Adjunct Assistant Professor by UCLA, a faculty position, and was no longer a member of the Sawyers lab.  Although he collaborated with both the members of the Sawyers lab and the Jung lab, and attended meetings and made presentations on the Prostate Cancer Project, he had his own research funding and was actually financially | (Ruggio Decl., **Ex. 42,** Nature Medicine 2004);<br><br>(Ruggio Decl., **Ex. 32**, 12/14/2018 Tran Dep. Tr., at 48:1-11, 100:17-25, );<br><br>(Ruggio Decl., **Ex. 43**, Chen Biography in Grant Application);<br><br>(Ruggio Decl., **Ex. 23**, Chen Employment Status Letter from UCLA)<br><br>(Ruggio Decl., **Ex. 34**, Grant Award Dated 1/4/04, "Principal Investigator: CHEN, CHARLIE");<br><br>(Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep. Tr., Chen Dep. Tr. at 124:1-13, 179:19-24); |

| | |
|---|---|
| supporting the research efforts by a member of the *Jung* lab (Dr. Ouk).  In the summer of 2004, Dr. Chen did not have an obligation to report to either Dr. Sawyers or Dr. Jung. | |
| 2. "2.  Michael Jung's lab, through Dr. Jung and Dr. Ouk, were the chemists."  (Def's SUF, at ¶ 2).<br><br>In fact, Dr. Chen was trained as a biochemist, and has a Ph.D. degree in Molecular Biology and Biochemistry.<br><br>Dr. Chen analyzed the structure-activity relationships of the "RD" compounds proposed and/or synthesized during and for the Prostate Cancer Project. | (Ruggio Decl., **Ex. 43**, Chen Biography in Grant Application);<br><br>(Ruggio Decl., **Ex. 1**, Chen LNB No. 1 ("3-31-03 to 7-18-04"), UC-CVJ00007712-34, 7778-7997) |
| 3. "3.  Charles Sawyers' lab, through Dr. Sawyers, and various scientists over the years were the biologists."  (Def's SUF, at ¶ 3).<br><br>In fact, Dr. Sawyers' lab included both biologists and chemists.  Dr. Chen, once a member of the Sawyers lab, had a Ph.D. in Molecular Biology and Biochemistry.<br><br>Furthermore, to the extent the Defendants' use of the terms "scientists" and "biologists" suggests individuals with a doctorate in a biological science, Dr. Sawyers has a medical degree, but no Ph.D. in any discipline.  Two former members of the Sawyers lab who are also the current named inventors on the patents-in-suit, Mr. Christopher Tran and Mr. John Wongvipat, do not have a doctorate.  Mr. Tran worked as a lab technician.  Mr. Wonvipat was the lab manager for the Sawyers' lab and carried out both research tasks and administrative duties. | (Ruggio Decl., **Ex. 43**, Chen Biography in Grant Application);<br><br>(Ruggio Decl., **Ex. 44**, 1/12/2018 Sawyers Dep. Tr., at 37:22-38:3);<br><br>(Ruggio Decl., **Ex. 32**, 12/14/2018 Tran Dep. Tr., at 8:24-9:3);<br><br>(Ruggio Decl., **Ex. 45**, 12/20/2018 Wongvipat Dep. Tr., at 6-20). |
| 4. "4.  Dr. Chen was one such biologist working for a period of time in Charles Sawyers' lab." (Def's SUF, at ¶ 4). | |

| | |
|---|---|
| In fact, Dr. Chen was trained in biochemistry, and has a Ph.D. degree in Molecular Biology and Biochemistry.<br><br>Dr. Chen was promoted by UCLA to a faculty position on February 1, 2003, after receiving the "Chancellor's Award for Postdoctoral Research." He was a faculty member with his own extramural funding, and not a member of the Sawyers lab during the entirety of 2004 and 2005, until he resigned his position and left UCLA in September of 2005. | (Ruggio Decl., **Ex. 43**, Chen Biography in Grant Application);<br><br>(Ruggio Decl., **Ex. 23**, Chen Employment Status Letter from UCLA);<br><br>(Ruggio Decl., **Ex. 46**, Chancellor's Award for Postdoctoral Research);<br><br>(Ruggio Decl., **Ex. 34**, Grant Award Dated 1/4/04, "Principal Investigator: CHEN, CHARLIE");<br><br>(Ruggio Decl., **Ex. 35**, Chen Relinquishment of Grant) |
| 5. "5.  By August 2004, the two labs had started to develop a series of compounds called the 'RD-series' compounds." (Def's SUF, at ¶ 5).<br><br>In fact, by August 2004, Dr. Chen was an Adjunct Assistant Professor, had his own research funding, financially supported the Prostate Cancer Project through his support of Dr. Ouk, and collaborated with both the Sawyers lab and the Jung lab.  There were more than "two labs" working on the Prostate Cancer Project in August of 2004.<br><br>Dr. Chen gave the "RD" or "Rational Design" name to the compounds made during and for the Prostate Cancer Project.  Dr. Chen's work (along with Dr. Sawyers' group) laid the foundation and pointed out the direction for the entire Prostate Cancer Project.  Dr. Chen was a driving force and "definitely" the project leader for the project to find androgen receptor antagonists to treat | Ruggio Decl., **Ex. 42**, Nature Medicine 2004;<br><br>Ruggio Decl., **Ex. 1**, Chen LNB No. 1 ("3-31-03 to 7-18-04"), UC-CVJ00007712-33 ("RD = Ration Design");<br><br>(Ruggio Decl., **Ex. 32**, 12/14/2018 Tran Dep. Tr., at 48:1-11, 49:1-3,100:17-25);<br><br>(Ruggio Decl., **Ex. 43**, Chen Biography in Grant Application);<br><br>(Ruggio Decl., **Ex. 23**, Chen Employment Status |

| | |
|---|---|
| previously untreatable "castration resistant" or "hormone refractory" prostate cancer.<br><br>To the extent Defendants are using the term "RD-series compounds" to refer to chemical compounds with a benzene left-side ring and a thiohydantoin middle ring, the Prostate Cancer Project led by Dr. Chen involved a broader category of chemical compounds.  The chemist who synthesized the compounds for the project, Dr. Samedy Ouk, simply assigned the next hypothesized compound with the next "RD###" regardless of whether the compound shared any structural similarity to any other compound labeled as an RD.  The "RD List" of compounds includes thiohydantoins and hydantoins, imines, succinimides, diaryl thiohydantoins, aryl heteroaryl thiohydantoins, pyrazolones, etc. | Letter from UCLA)<br><br>(Ruggio Decl., **Ex. 34**, Grant Award Dated 1/4/04, "Principal Investigator: CHEN, CHARLIE");<br><br>(Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep. Tr., Chen Dep. Tr. at 124:1-13, 179:19-24);<br><br>(Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., at 38:11-14);<br><br>(Ruggio Decl., **Ex. 47**, 7/23/2012 Jung Dep. Tr., at 294:5-7 ("It wasn't arbitrary at all. We just said RD1, 2, 3, 4, 5 until we stopped."); 321:15-22 ("the RD nomenclature was used as sort of a catch-all that Samedy Ouk used to number all of his compounds…"));<br><br>Ruggio Decl., **Ex. 1**, Chen LNB No. 1 ("3-31-03 to 7-18-04"), UC-CVJ00007712-33 (list of RD#'s by date, many different structures for compounds, broader than just "RD-series" compounds if the latter is defined by a benzene ring structure on the left side and a thiohydantoin ring |

| | structure in the middle). |
|---|---|
| 6. "6.  At that time, in August 2004, the chemists involved were Dr. Jung and Dr. Ouk, and the biologists included Dr. Sawyers and Dr. Chen." (Def's SUF, at ¶ 6).<br><br>*See* Plaintiff's response above in ¶¶ 2-3 and the evidentiary support therefor, which are incorporated by reference herein.  Dr. Sawyers was and is a medical doctor.  Dr. Chen had and has a Ph.D. in biochemistry. | |
| 7. "7.  The two labs would work together and routinely meet to discuss the project." (Def's SUF, at ¶ 7).<br><br>*See* Plaintiff's response above in ¶¶ 1, 4-5 and the evidentiary support therefor, which are incorporated by reference herein.  The Prostate Cancer Project was carried out by members of the Sawyers lab, Dr. Ouk (a member of the Jung lab), and Dr. Chen, who was a faculty member and not a member of the Sawyers lab or the Jung lab in late 2003, 2004, or 2005.<br><br>Furthermore, Dr. Jung did not "routinely" meet with the members of the Sawyers lab or Dr. Chen to discuss the project.  He could only point to a few calendar entries throughout 2004 that could possibly indicate such meetings. | Additional support:<br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., 85:9-86:1). |
| 8. "9.  Instead, Dr. Jung called the meeting to discuss ideas for new compounds that were distinct and different from the RD-series." (Def's SUF, at ¶ 9).<br><br>In fact, Dr. Jung called the meeting because there was a perceived problem with a third-party patent covering some of the RD compounds, those that were based on a benzene and thiohydantoin ring structures.  The discussion was about how to | (Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep Tr., at 78-79, 90:25-91:11);<br><br>(Ruggio Decl., **Ex. 5**, "Final Ouk Letter" dated 11-15-2005 ("I suggested three ideas")); |

| | |
|---|---|
| "come up with compounds that were novel and *could be patented*." To the extent Defendants' use of the term "distinct and different" suggests making compounds with different biological activities or pharmacokinetics ("PK") characteristics from RD-series compounds, that was not the purpose of the August 31, 2004 meeting, nor is there any contemporaneous document to show that improving activity or PK was even part of that discussion.<br><br>Furthermore, Dr. Ouk wrote in November of 2005 that he, not Dr. Jung, suggested the idea of using a heterocyclic ring (which could be a pyridine ring) on the left side of the RD-series compounds. | (Ruggio Decl., **Ex. 57**, 11-14-2005 Email from Jung to Ouk "I have made several minor corrections to your letter."). |
| 9. "10. At that meeting, the chemists, Dr. Jung and Dr. Ouk, discussed several possible new chemical scaffolds." (Def's SUF, at ¶ 10).<br><br>In fact, Dr. Chen is a biochemist, and Dr. Chen's laboratory notebooks indicate that he analyzed the structure-activity relationships for the RD compounds to help identify both useful and unhelpful substituents (subparts) for a compound.<br><br>There is no contemporaneous evidence that describes who said what at this August 31, 2004 meeting. It is undisputed that Dr. Chen was at the August 31, 2004 meeting along with Dr. Jung, Dr. Sawyers, and Dr. Ouk.<br><br>Dr. Sawyers does not have a recollection of what was discussed at the meeting.<br><br>Dr. Jung does not have a clear recollection of what the biologists and/or biochemist present at the meeting, including Dr. Chen, had said at the meeting. | (Ruggio Decl., **Ex. 1**, Chen LNB No. 1, at UC-CVJ00007715-7722, 7778-7997) (handwritten notations in the charts, structure-activity analyses));<br><br>(Ruggio Decl., **Ex. 26**, 12/11/2018 Sawyers Dep Tr., at 141:10-142:16;<br><br>(Ruggio Decl., **Ex. 36**, Jung 1/4/19 Dep. Tr. at 118:1-8 (Drs. Chen and Sawyers "may have made comments")). |
| 10. "11. One of the ideas that Dr. Ouk and Dr. | |

Jung jointly came up with was to add a nitrogen atom (also referred to as substituting a pyridine ring or a heterocyclic ring) into the left-hand ring of an RD-series molecule." (Def's SUF, at ¶ 11).

In fact, there is no corroborating document that supports this statement by Defendants. Defendants cite to the November 15, 2005 letter, which was created more than a year after the fact and which Dr. Jung admitted to editing. However, in that letter, Dr. Ouk stated that *he*, not Dr. Jung and he "jointly" as Defendants stated, suggested the pyridine or "heterocyclic ring" idea at the meeting.

In Dr. Ouk's first version of the "A51 story" letter, dated October 27, 2005, Dr. Ouk stated: "You can discuss with Pr. Jung. He didn't know about A51 yet. This A51 is not the same as the class of the original compound that we just patent."

In Dr. Ouk's responsive email to Dr. Sawyers on November 6, 2005, Dr. Ouk reiterated that "I will e-mail Prof Jung to let him know about the existing [sic] of A51. So you can talk to him." This statement, made in November of 2005, clearly demonstrates that Dr. Jung was ***unaware*** of A51 when it was synthesized and tested. This statement disappeared in the finalized November 15, 2005 version of the letter after Dr. Jung edited the draft.

Likewise, in the A51/A52 Invention Report that Dr. Jung drafted, Dr. Jung stated that the "date of conception" was October 18, 2004 (which was when Dr. Ouk began synthesizing A51), and not the August 31, 2004 meeting like Defendants now claim.

Further, during Dr. Ouk's 2012 deposition in the *Medivation* litigation, he was asked if Dr. Jung helped design the "A-series" to which Dr. Ouk

(Ruggio Decl., **Ex. 18**, 10-27-2005 Dr, Ouk's First Letter);

(Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Dr. Ouk to Dr. Sawyers);

(Ruggio Decl., **Ex. 57**, 11-14-2005 Email from Jung to Ouk "I have made several minor corrections to your letter.");

(Ruggio Decl., **Ex. 5**, 11-15-2005 Ouk Final Letter);

(Ruggio Decl., **Ex. 11**, A51/A52 Invention Report (10/18/2004));

(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep Tr., at 144:24-25 ("Q: You filled out this invention report, right?" "A: Yes, I did."))

(Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., 186:22-24 (asked if Dr. Jung designed "the A series scaffold" and Dr. Ouk responded "No, especially not."));

(Ruggio Decl., **Ex. 49**, 8-23-2013 Email from Dr. Ouk to Mr. Wongvipat, "Jung is clearly not

answered: "No, especially not."

Furthermore, in 2013, at the joint request of Dr. Ouk and Dr. Chen, their attorney sent the Regents a letter stating that "Dr. Ouk and Dr. Chen have both confirmed that they two together conceived the structure of A51 in early October 2004 on the lunch table at the 'bomb shelter' (a lunch area) at UCLA and surmised that, like the compounds of the RD series licensed to Medivation, the compound A51 may be used to treat prostate cancer." The letter further stated that "Dr. Ouk and Dr. Chen have both indicated that Dr. Michael Jung did not contribute to the invention of the '507 patent and should be removed from the list of inventors." "Dr. Michael Jung did not conceive A51 and A52, nor did Dr. Michael Jung design or synthesize A51 and A52 or test their biological activities." Dr. Ouk confirmed and approved of the substance of this letter on November 7, 2013 before Dr. Rao mailed it.

With respect to the "handwritten notes" from Dr. Jung, they ***do not have a date*** on it. In 2012, when Dr. Jung was asked about the notes in question, he could not ascribe a date but reasoned that it must have been sometime after the meeting but before March or May of 2005, because a part of these "notes" discussed a chemical structure called "pyrazolone," which is not a pyridine-containing structure like the A-series compounds. Seven years later, in 2019, Dr. Jung gained a vivid recollection of when he prepared this document, which he testified to be shortly after the August 31, 2004 meeting.

Further, when Dr. Ouk was questioned about the "handwritten notes" at his deposition in this case, Dr. Ouk stated: "the first page I don't recognize. The second page I don't recognize." There is no

inventor … He doesn't want to wake up that monster.");

(Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");

(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks. Samedy.");

(Ruggio Decl., **Ex. 47**, 7/23/2012 Jung Dep. Tr., at 581:22-582:2, 582:6-583:5);

(Ruggio Decl., **Ex. 29**, 11/13/2018 Ouk Dep. Tr., at 179:25-180:12).

| | |
|---|---|
| evidence demonstrating Dr. Ouk ever received the first two pages of Dr. Jung's "handwritten notes" or that they were drafted before A51 was synthesized by Dr. Ouk and tested for biological activity by Dr. Chen.  For all anyone knows, they could have been drafted one day after the filing of the *Medivation* suit.<br><br>Therefore, the testimony from Dr. Jung and Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time. | |
| 11. "12.  Dr. Jung and Dr. Ouk had a very specific scientific rationale for changing the left-hand ring by adding a nitrogen atom and why that addition would work.  In particular, applying their nuanced understanding of Chemistry, Dr. Jung and Dr. Ouk had the inventive insights that placing the nitrogen atom in a particular position would achieve additional hydrogen bonding, yet not have negative impacts that might otherwise be expected of the more polar left-hand pyridine ring, and according had a belief that this would result in a better binding and better activity to treat prostate cancer." (Def's SUF, at ¶ 12).<br><br>In fact, there is no contemporaneously generated evidence supporting any part of Defendants' Statement above.  To the contrary, in Dr. Ouk's November 15, 2005 "A51 story" letter, which Dr. Jung admitted to editing, Dr. Ouk told the story of how Dr. Chen refused to give him the biological activity testing data on A51 in February, 2005, and, as a consequence, "[f]rom February to October 2005, our A51 project was on hold" because he "did not have the data on its biological activity." (UC-CVJ00000142, Ex.5).  Furthermore, Dr. Ouk wrote in the same 2005 letter, "I *urgently needed our new compounds be tested.*"  (UC- | (Ruggio Decl., **Ex. 18**, 10-27-2005 Dr, Ouk's First Letter);<br><br>(Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Dr. Ouk to Dr. Sawyers);<br><br>(Ruggio Decl., **Ex. 57**, 11-14-2005 Email from Jung to Ouk "I have made several minor corrections to your letter.")<br><br>(Ruggio Decl., **Ex. 5**, 11-15-2005 Ouk Final Letter);<br><br><br>(Ruggio Decl., **Ex. 49**, 8-23-2013 Email from Ouk to Wongvipat, "Jung is clearly not inventor … He doesn't want to wake up that monster."); |

CVJ00000141, Ex. 5) (emphasis added).  These statements completely contradict Defendants' Statement above that Dr. Jung and Dr. Ouk already had "nuanced understanding" or any "inventive insights" that the pyridine substitution would "result in a better binding and better activity."

Even in Dr. Ouk's email to Dr. Sawyers on November 6, 2005, Dr. Ouk reiterated that he "will e-mail Prof Jung to let him know about the existing [sic] of A51. So you can talk to him."

The "handwritten notes" from Dr. Jung *do not have a date* on it.  In 2012, when Dr. Jung was asked about the notes in question, he could not ascribe a date but reasoned that it must have been sometime after the meeting but before March or May of 2005, because a part of these "notes" discussed a chemical structure called "pyrazolone," which is not a pyridine-containing structure like the A-series compounds.  Seven years later, in 2019, Dr. Jung gained a vivid recollection of when he prepared this document, which he testified to be shortly after the August 31, 2004 meeting.

Further, when Dr. Ouk was questioned about the "handwritten notes" at his Deposition in this case, Dr. Ouk stated: "the first page I don't recognize. The second page I don't recognize."  There is no evidence demonstrating Dr. Ouk ever received the first two pages of the handwritten notes or that they were drafted before A51 was synthesized by Dr. Ouk and tested for biological activity by Dr. Chen. For all anyone knows, they could have been drafted one day after the filing of the *Medivation* suit.

<u>Therefore, the testimony from Dr. Jung and Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of</u>

(Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");

(Ruggio Decl., **Ex. 47**, 7/23/2012 Jung Dep. Tr., at 581:22-582:2, 582:6-583:5);

(Ruggio Decl., **Ex. 29**, 11/13/2018 Ouk Dep. Tr., at 179:25-180:12);

(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks. Samedy.")

(Ruggio Decl., **Ex. 58**, 3-15-2016 Email from Ouk to Tran and Wongvipat, "I told Charles that I believe Jung is the root of the problem." … "They will reshuffle A52 inventorship. It is so easy to do.  They did in the past. If they win on such illogic argument, they will want more and more.");

(Ruggio Decl., **Ex. 50**, 12-13-2017 Email from Mr. Wongvipat to Dr. Ouk "It makes Jung out to be the clever mastermind. He was so clever that he didn't even know about A51/A52 when

| | |
|---|---|
| time. | it was created. Lol."); |
| 12. "13.  Dr. Ouk and Dr. Jung, applying their chemistry expertise, believed that the structure of A51 would result in an active compound that would be effective to treat prostate cancer." (Def's SUF, at ¶ 13).<br><br>*See* Plaintiff's response to Def's SUF, ¶ 12, and citations to the record in support thereof, above, in ¶ 11, which are incorporated by reference herein.<br><br>Plaintiff further states that, in fact, there is no evidence that Dr. Jung had knowledge of the synthesis and testing of A51 in early 2005.  Dr. Jung testified in 2019, for the first time, that he knew about the synthesis and testing of A51 back in early 2005.  Defendants also cited to Dr. Ouk's deposition testimony.  However, Dr. Ouk had repeatedly stated—in documents closer to the relevant period of time—that Dr. Jung did not know about A51 as of early *November of 2005*.  Likewise, Dr. Ouk has maintained the position that Dr. Jung is not an inventor on the A-series patents in various statements made in 2011, 2012, 2013, 2016, and 2017—up until Dr. Chen filed this lawsuit.<br><br><u>Therefore, the testimony from Dr. Jung and Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time.</u> | (Ruggio Decl., **Ex. 18**, 10-27-2005 Dr, Ouk's First Letter);<br><br>(Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Dr. Ouk to Dr. Sawyers);<br><br>(Ruggio Decl., **Ex. 49**, 8-23-2013 Email from Dr. Ouk to Mr. Wongvipat, "Jung is clearly not inventor … He doesn't want to wake up that monster.");<br><br>Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");<br><br>(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks. Samedy.");<br><br>(Ruggio Decl., **Ex. 58**, 3-15-2016 Email from Dr. Ouk to Mr. Tran and Mr. Wongvipat, "I told Charles that I believe Jung is the root of the problem." … "They will reshuffle A52 inventorship. It is so easy to do.  They did in the past. If they win on such illogic argument, they will want more and more."); |

| | |
|---|---|
| | (Ruggio Decl., **Ex. 50**, 12-13-2017 Email from Mr. Wongvipat to Dr. Ouk "It makes Jung out to be the clever mastermind. He was so clever that he didn't even know about A51/A52 when it was created. Lol."); |
| 13. "14.  Dr. Chen admits that he did not take notes during the August 2004 meeting and there are no documents to support Dr. Chen's version of the events at the August 2004 meeting." (Def's SUF, at ¶ 14).<br><br>In fact, there is a document **with a date on it** supporting Dr. Chen's version of events; Dr. Jung cannot show the same.  The earliest, dated, document in this case relevant to and reflecting the synthesis of any A-series compound is an email, in which Dr. Ouk asked Dr. Chen to purchase an ingredient for the synthesis of A51.  The document was dated October 13, 2004, five days before Dr. Ouk began synthesizing A51.<br><br>This email supports the version of events Dr. Ouk and Dr. Chen's jointly retained attorney (Dr. Rao) represented in 2013, which is that, after the August 31, 2004 meeting, "Dr. Ouk and Dr. Chen … together conceived the structure of A51 in early October 2004 on the lunch table at the bomb shelter at UCLA."  The version of events in the November 11, 2013 Rao Letter was consistent with Dr. Ouk's testimony given in 2012 in the *Medivation* case, when he was asked to explain "how [the conception] process actually occurred."  Dr. Ouk testified that he had talks with Dr. Jung, Dr. Chen, Dr. Sawyers, and another individual named Derek Welsbie, "and some other time in the lunch when I have with Dr. Chen, the lunch table."  He was then asked, "and you were talking about | (Ruggio Decl., **Ex. 10**, 10-13-2004 Email from Dr. Ouk to Dr. Chen for A51 ingredient);<br><br>(Ruggio Decl., **Ex. 6**, Ouk LNB No. 4, at UC-CVJ00000557);<br><br>Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");<br><br>(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks. Samedy.");<br><br>(Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., at 24:16-25:4);<br><br>(Ruggio Decl., **Ex. 11**, A51/A52 Invention Report (10/18/2004));<br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep Tr., at 144:24-25 ("Q: You filled out this invention report, |

13

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| trying to create a new series?," to which Dr. Ouk responded, "Yes. Yes." | right?" "A: Yes, I did.") Report). |
| Furthermore, in the A51/A52 Invention Report that Dr. Jung drafted in December of 2005, Dr. Jung stated the "date of conception" was October 18, 2004. He did not record the "August 31, 2004" date he now claims. | |
| Therefore, the testimony from Dr. Jung and Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time. | |
| 14. "16. Dr. Jung confirmed that at the August 2004 meeting only he and Dr. Ouk conceived of the structure of the A-series compounds, that the biologists were not active in the chemistry discussion, which was the topic of the meeting, and that Dr. Chen did not make comments about or contribute to the idea of the structure of the A-series compounds." (Def's SUF, at ¶ 16).<br><br>*See* Plaintiff's statements above in ¶¶ 9-10, 13, and the evidentiary support therefor, all of which are incorporated by reference herein. Dr. Ouk's November 15, 2005 letter states that he alone suggested pyridine substitution at the August 31, 2004 meeting. Dr. Jung testified at his Jan. 4, 2019 deposition Dr. Chen and Dr. Sawyers "may have made comments" at the August 31, 2004 meeting. Dr. Ouk testified at a 2012 deposition that he had lunch with Dr. Chen and talked about trying to create a new series. Dr. Ouk did not start to synthesize the first A-series compound until mid-October 2004. In an Invention Report drafted by Dr. Jung in 2005, he put down "October 18, 2004" as the date of conception for the A-series compounds. | |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| <u>Therefore, the testimony from Dr. Jung and Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time.</u> | |
| 15. "17.  Dr. Sawyers is unaware of any contributions of Dr. Chen to the conception of A51."  (Def's SUF, at ¶ 17).<br><br>In fact, Dr. Sawyers was unaware of any activities relating to the conception, synthesis, and testing of the first A-series compound, A51, that occurred in late 2004 and early 2005.  The first he heard of the synthesis of A51 was in October of 2005, when Dr. Ouk told him a version of an "A51 story."  Dr. Sawyers was also unaware that Dr. Chen was a faculty member of UCLA in 2004 and 2005, or that Dr. Chen had his own research grant funding and was financially supporting Dr. Ouk's research activity relating to the Prostate Cancer Project.<br><br>Furthermore, Dr. Sawyers cannot recall with any specificity of the discussions that may or may have occurred during the August 31, 2004 meeting.<br><br><u>Therefore, testimony from Dr. Sawyers (who was factually unaware of A51 until late 2005) about Dr. Chen's contribution to A51 is unsupported and not credible.</u> | (Ruggio Decl., **Ex. 44**, 1/12/2019 Sawyers Dep. Tr., at 20:23-21:9, 22:2-15, 22:18-23:4);<br><br>(Ruggio Decl., **Ex. 26**, 12/11/2018 Sawyers Dep Tr., at 147:4-148:12 (cannot recall any specifics of the August 31, 2004 meeting including any discussion on the idea of replacing the first aryl ring with a heterocyclic ring));<br><br>(Ruggio Decl., **Ex. 18**, 10-27-2005 Dr. Ouk's First Letter);<br><br>(Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Dr. Ouk to Dr. Sawyers re: A51). |
| 16. "18.  Dr. Ouk does not recall Dr. Chen making any suggestions about the structure, biological properties, the starting point, or the synthesis route for the A-series compounds." (Def's SUF, at ¶ 18).<br><br>In fact, Dr. Ouk's previous statements and testimony regarding the conception of A51 contradict this "fact."  Defendants only cite to Dr. Ouk's November 13, 2018 deposition testimony for support. | (Ruggio Decl., **Ex. 18**, 10-27-2005 Dr. Ouk's First Letter);<br><br>(Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Dr. Ouk to Dr. Sawyers re: A51);<br><br>(Ruggio Decl., **Ex. 27**, |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

For example, in Dr. Ouk's October 27, 2005 letter, he stated that "*we* had made one compound" and that "You can discuss with Pr. Jung. He didn't know about A51 yet. This A51 is not the same as the class of the original compound that we just patent." According to Dr. Ouk's statement in the October 27, 2005 version of the "A51 story," Dr. Jung and Dr. Sawyers were unaware of the first synthesis of A51, yet Dr. Ouk was referring to a plural "we" as involved in the making of A51.

At Dr. Ouk's 2012 deposition in *Medivation* when he was asked to explain "how [the conception] process actually occurred," Dr. Ouk discussed "some other time in the lunch when I have with Dr. Chen, the lunch table." He was then asked, "and you were talking about trying to create a new series?," to which Dr. Ouk responded, "Yes. Yes."

On November 11, 2013, Dr. Ouk and Dr. Chen's jointly retained attorney, Dr. Rao, sent the Regents a letter stating that "Dr. Ouk and Dr. Chen have both confirmed that they two together conceived the structure of A51 in early October of 2004 on the lunch table at the bombshelter at UCLA and surmised that, like the compounds of the RD series licensed to Medivation, the compound A51 may be used to treat prostate cancer." Further, the letter states that "Dr. Ouk and Dr. Chen have both indicated that Dr. Michael Jung did not contribute to the inventions of the '507 patent and should be removed from the list of inventors" because he "did not conceive A51 and A52, nor did Dr. Michael Jung design or synthesie A51 and A52 or test their biological activities."

Therefore, the testimony from Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made

5/14/2012 Ouk Dep Tr., at 24:16-25:4);

(Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");

(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks. Samedy").

| | |
|---|---|
| closer to the relevant period of time. | |
| 17. "19.  Dr. Ouk testified that A51 was conceived prior to October 2004." (Def's SUF, at ¶ 19).<br><br>In fact, there is no evidence that A51 was conceived of prior to October 2004.<br><br>For example, Dr. Jung was unaware of A51 until November of 2005.  After becoming aware of A51 in November of 2005, from Dr. Ouk,  Dr. Jung recorded "October 18, 2004" as the "date of conception" on the A51/A52 Invention Report. This Invention Report was drafted in December, 2005, and was signed by Dr. Jung, Dr. Sawyers, *and Dr. Ouk*.  This document, generated near the relevant time, contradicts Dr. Ouk's current recollection.<br><br>On November 11, 2013, Dr. Ouk and Dr. Chen's jointly retained attorney, Dr. Rao, sent the Regents a letter stating that "Dr. Ouk and Dr. Chen have both confirmed that they two together conceived the structure of A51 in early October of 2004 on the lunch table at the bombshelter at UCLA and surmised that, like the compounds of the RD series licensed to Medivation, the compound A51 may be used to treat prostate cancer."  Further, the letter states that "Dr. Ouk and Dr. Chen have both indicated that Dr. Michael Jung did not contribute to the inventions of the '507 patent and should be removed from the list of inventors" because he "did not conceive A51 and A52, nor did Dr. Michael Jung design or synthesize A51 and A52 or test their biological activities."  Dr. Ouk approved of the substance of this letter before Dr. Rao mailed it to the Regents.<br><br><u>Therefore, the testimony from Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made</u> | (Ruggio Decl., **Ex. 18**, 10-27-2005 Dr. Ouk's First Letter);<br><br>(Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Dr. Ouk to Dr. Sawyers re: A51);<br><br>(Ruggio Decl., **Ex. 11**, A51/A52 Invention Report (10/18/2004));<br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., at 144:24-25);<br><br>(Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");<br><br>(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks. Samedy"). |

| | |
|---|---|
| closer to the relevant period of time. | |
| 18. "20.  Dr. Ouk does not recall having any conversations with Dr. Chen regarding the A51 compound between August 2004 and October 18, 2004, the date that Dr. Ouk began to make A51." (Def's SUF, at ¶ 20).<br><br>In fact, Dr. Ouk's May, 2012 deposition testimony in the *Medivation* case contradicts his testimony in this case.  For their SUF, ¶ 20, Defendants only cited Dr. Ouk's November 13, 2018 deposition for support.  However, in the 2012 deposition, Dr. Ouk was asked to explain "how [the conception] process actually occurred," and Dr. Ouk discussed "some other time in the lunch when I have with Dr. Chen, the lunch table."  He was then asked, "and you were talking about trying to create a new series?," to which Dr. Ouk responded, "Yes. Yes."<br><br>In the instant case, Dr. Chen testified about the conversations he had with Dr. Ouk at the "bomb shelter" lunch place between August 2004 and October 18, 2004, regarding A51.<br><br>Furthermore, the earliest, dated, document in this case indicating the conception and synthesis of an A-series compound was an email sent by Dr. Ouk to Dr. Chen on October 13, 2004, five-days before Dr. Ouk started to synthesize A51 on Oct. 18, 2004.  This document demonstrates that Dr. Chen was aware of and involved in the initial synthesis of A51.<br><br><u>Therefore, the testimony from Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time.</u> | (Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., at 24:16-25:4);<br><br>(Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 77:22-25, 81:17-83:6);<br><br>(Ruggio Decl., **Ex. 10**, 10-13-2004 Email from Dr. Ouk to Dr. Chen re: A51 ingredient);<br><br>(Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");<br><br>(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks."). |
| 19. "21.  Dr. Chen admits that he has no notes or documents from the fall of 2004 reflecting any | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| alleged conversations with Dr. Ouk, nor reflecting any alleged conversations with Dr. Ouk, nor reflecting any structure with a pyridine ring." (Def's SUF, at ¶ 21).<br><br>In fact, Dr. Chen does have a document dated to Oct. 13, 2004, to reflect his September or October 2004 lunch conversations with Dr. Ouk. Dr. Chen testified that he discussed a "BMS" patent with Dr. Ouk in early October when discussing a pyridine substitution with Dr. Ouk. Dr. Ouk then requested Dr. Chen purchase the key intermediate ingredient for making any A-series compounds, called 3-trifluoromethyl pyridine, on October 13, 2004. Five days later, Dr. Ouk began synthesizing A51. | at 135:16-22, 136:8-16);<br><br>(Ruggio Decl., **Ex. 51**, BMS Salvati et al., US Patent Application Publication dated April 22, 2004);<br><br>(Ruggio Decl., **Ex. 10**, 10-13-2004 Email from Dr. Ouk to Dr. Chen re: A51 ingredient);<br><br>(Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");<br><br>(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks."). |
| 20. "23. Dr. Chen admits that he has no contemporaneously created documents to corroborate his claimed October 2004 lunch conversation with Dr. Ouk regarding the A-series." (Def's SUF, at ¶ 23).<br><br>In fact, Dr. Chen does have a contemporaneously created document to corroborate his claimed September or October 2004 lunch conversations with Dr. Ouk. For example, Dr. Chen testified that he discussed a "BMS" patent with Dr. Ouk in early October when discussing a pyridine substitution with Dr. Ouk. Dr. Ouk then requested that Dr. Chen purchase the key intermediate ingredient, 3-(trifluoromethyl)pyridine, on October 13, 2004. Five days later, Dr. Ouk began synthesizing A51. | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep. Tr., at 81:17-83:6);<br><br>(Ruggio Decl., **Ex. 51**, BMS Salvati et al., US Patent Application Publication dated April 22, 2004);<br><br>(Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");<br><br>(Ruggio Decl., **Ex. 10**, 10-13-2004 Email from Dr. |

| | |
|---|---|
| | Ouk to Dr. Chen re: A51 ingredient);<br><br>(Ruggio Decl., **Ex. 6**, Ouk LNB No. 4, at UC-CVJ00000562 (dated Oct. 18, 2004)). |
| 21. "24.  Dr. Chen is not a chemist." (Def's SUF, at ¶ 24).<br><br>In fact, Dr. Chen has a Ph.D. in Molecular Biology and Biochemistry, as well as a M.S. in Biochemistry. | (Ruggio Decl., **Ex. 43**, Chen Biography in Grant Application). |
| 22. "25.  Dr. Sawyers and Dr. Ouk testified that Dr. Chen did not contribute chemistry knowledge to conception of the A-series chemical structures." (Def's SUF, at ¶ 25).<br><br>In fact, in 2008, when Dr. Jung had emailed Dr. Ouk and asked him to "rewrite" his November 15, 2005 "A51 story" letter, Dr. Ouk responded by saying "A51 is the twin of RD37.  At the time A51 was designed to compare apple to apple with RD37."  The reason Dr. Ouk decided to use RD37 as the structural template, instead of, for example, RD25, RD55, RD85, etc., was because by October 2004, Dr. Chen had already demonstrated that RD37 showed great activity with the *in vitro* assays that Dr. Chen designed, and relayed that information to Dr. Ouk, Dr. Jung, and Dr. Sawyers.<br><br>Further, Dr. Jung's testimony confirms that "we already knew that 162 now was quite good, it would be natural to take the left-hand pyridine piece and put it with 162."  Dr. Jung is correct, except that he was not the first one to have this "natural" revelation since he was not the first one to discover whether RD162 would be an active compound with good PK properties to serve as the | (Ruggio Decl., **Ex. 52**, 12/31/2018 Defendants' Responses to Requests for Admissions No. 24, 25, 26, and 27);<br><br>(Ruggio Decl., **Ex. 53**, 1-13-2008 Email from Jung to Ouk, "attach[ing] your original letter," asking Dr. Ouk to "rewrite" it and to "Please use the same date (11/15/05), sign the revised letter and get it back to me ASAP!");<br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep Tr., at 259:23-260:4);<br><br>(Ruggio Decl., **Ex. 22**, 7-29-2005 Email from Sawyers to Jung, "Yesterday Charlie told me the same thing about RD-162"); |

| | |
|---|---|
| "natural" choice of combining with "the left-hand pyridine piece." Dr. Jung and Dr. Sawyers both confirmed that they learned about "the good activity" and good PK of RD162 from Dr. Chen in July of 2005. | (Ruggio Decl., **Ex. 18**, 10-27-2005 Dr. Ouk's First Letter). |
| The selection of the right-hand side structures to be combined with "the left-hand pyridine piece" to make both A51 and A52 was accomplished by Dr. Chen through his biological testing and analysis of RD37 and RD162. No other "chemistry knowledge" was required for the conception of A51 and A52. | |
| Therefore, the testimony from Dr. Ouk and Dr. Sawyers offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time. | |
| 23. "26.  Dr. Chen admitted at his deposition that he lacks a basic understanding of elementary organic chemistry concepts relating to A51 and A52 and principles described in a patent that he later had filed in China, which includes structures containing a left-hand pyridine ring." (Def's SUF, at ¶ 26). | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 110:7-10, 229:12-230:7); (Declaration of Ron Bihovsky, Ph.D. ("Bihovsky Decl."), at ¶¶ 83-90)); |
| In fact, Dr. Chen had an understanding of "elementary organic chemistry concepts" including that pyridine and benzene rings are "similar aromatic structure[s]," the "aromatic function is important" for the "binding property" of the molecules, and the previously available prostate cancer drugs contained benzene ring structures important for binding to the androgen receptor. | |
| Furthermore, once a hypothesis of pyridine substitution for a benzene ring was proposed, Dr. Chen had already worked out the conditions for bioassays and had these assays available to take an | |

21

| | |
|---|---|
| empirical approach and test the hypothesis of whether pyridine substitution on RD-series compounds would result in compounds with similar activities, without having to rely on any further chemistry knowledge or predictions based on any chemistry principles. | |
| 24. "33. Dr. Chen admitted that he did not understand the reasoning for why the nitrogen atom was placed at the top of the pyridine ring in the A51 and A52 chemical structures, or whether placement would be better at the top or bottom of those structures." (Def's SUF, at ¶ 33).<br><br>In fact, as Dr. Chen has testified, he noticed the pyridine ring containing the trifluoromethyl ($CF_3$) and cyano (CN) side groups in a "BMS" patent document and discussed it with Dr. Ouk in early October, 2004. Dr. Chen recognized the availability of a precursor compound that could be used to synthesize pyridine-substituted RD compounds (i.e. A-series compounds), and the disclosure in the prior art of a way to synthesize the precursor compound.<br><br>The pyridine ring disclosed in that patent application publication (the BMS Salvati reference) has *the exact same* trifluoromethyl and cyano substituents as in the A-series compounds, and the nitrogen atom "placed at the top of the pyridine ring" as Defendants phrased it (when the entire structure as drawn on page 282 of the BMS Salvati reference is rotated 180 degrees).<br><br>To the extent Defendants' Statement ¶ 33, quoted above, was used to suggest that any understanding of whether the nitrogen atom's "placement would be better at the top or bottom of those structures" was necessary for the conception of A51 or A52, or that such understanding was actually involved in the conception of A51 or A52, there is no evidence | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 81:17-83:7);<br><br>(Ruggio Decl., **Ex. 51**, BMS Salvati et al., US Patent Application Publication dated April 22, 2004);<br><br>(Ruggio Decl., **Ex. 5**, 11-15-2005 Dr. Ouk's Final Letter, at UC-CVJ0000140);<br><br>(Ruggio Decl., **Ex. 57**, 11-14-2005 Email from Jung to Ouk "I have made several minor corrections to your letter."). |

| | |
|---|---|
| supporting such a suggestion.  Dr. Ouk's November 15, 2005 "A51 story" simply stated that he "suggested replacing the first aryl ring with a heterocyclic ring," without explaining which of the possible placements of a nitrogen atom would be "better" or that any such consideration was actually involved in the course of conception. | |
| 25.  "36.  Dr. Chen has no appreciation for the difference that changing the benzene ring to a pyridine ring made on the patentability of the A-series compounds."  (Def's SUF, at ¶ 36).<br><br>In fact, the suggestion of changing the benzene ring to a pyridine ring for suitable RD-series compounds stemmed from a perceived patent problem.  Dr. Chen discussed the modification with Dr. Ouk following the August 31, 2004 meeting.<br><br>Defendants did not cite to anything that supports their Statement ¶ 36.  The portion of Dr. Chen's deposition testimony cited by Defendants in connection with their Statement ¶ 36, as well as the Winkler Declaration paragraphs cited for the same purpose, never referred to "the patentability" of anything. | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 81:17-83:7);<br><br>(Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., at 24:16-25:4). |
| 26.  "38.  Dr. Chen admits that he did not synthesize A51 and has no documents reflecting any participation in the synthesis of A51." (Def's SUF, at ¶ 38).<br><br>In fact, Dr. Chen does have a document reflecting his participation in the synthesis of A51.  For example, as Dr. Chen maintains conception occurred in early October 2004 at the lunch table, Dr. Ouk proceeded to send Dr. Chen an email on October 13, 2004, asking him to purchase a precursor compound (ingredient for chemical synthesis) useful for making an A-series compound and suggested by the BMS patent application | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 81:17-83:7);<br><br>(Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., at 24:16-25:4);<br><br>(Ruggio Decl., **Ex. 51**, BMS Salvati et al., US Patent Application Publication dated April 22, 2004); |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| publication on page 282. | (Ruggio Decl., **Ex. 10**, 10-13-2004 Email from Dr. Ouk to Dr. Chen for A51 ingredient); <br><br> (Ruggio Decl., **Ex. 6**, Ouk LNB No. 4, at UC-CVJ00000557); <br><br> Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507"); <br><br> (Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks."). |
| 27. "40.  Dr. Chen was unable to authenticate with any certainty a purported October 13, 2005 email from Dr. Ouk to Dr. Chen directing him to purchase a particular chemical." (Def's SUF, at ¶ 40). <br><br> Defendants' Statement ¶ 40 appears to postulate a legal conclusion regarding authentication of a document at trial, and is not a statement of fact. <br><br> Presumably, Defendants were referring to the October 13, 200*4* email from Dr. Ouk to Dr. Chen regarding the purchase of a chemical compound precursor useful for making A-series compounds. Dr. Chen testified that he received the email from Dr. Ouk on October 13, 2004.  This testimony is not contradicted by any other testimony or document. | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 136:8-13)). |
| 28. "43.  This was a frequent occurrence because there were more funds in the Sawyers' lab." (Def's | |

| | |
|---|---|
| SUF, at ¶ 43). | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 124:1-13)). |
| In fact, Dr. Chen supported Dr. Ouk's work in the Prostate Cancer Project using his own grant, and not "funds in the Sawyers' lab." | |
| 29. "44.  Dr. Chen admits that he did not conceive of using 3-(trifluoromethyl)pyridine in the process of synthesizing A51." (Def's SUF, at ¶ 44). | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 81:17-83:6); |
| In fact, Dr. Chen testified that he saw a precursor compound disclosed in the BMS Salvati patent application publication on page 282.  Page 282 of the BMS Salvati document discloses 2-cyano-5-nitro-3-trifluoromethylpyridine ("Compound 763E"), which has the same trifluoromethyl and cyano substitutions as in the beneze ring structure of the RD-compounds and the pyridine ring structure for the proposed A-series compounds, and, therefore, was recognized by Dr. Chen as a precursor for compounds that are "modulators of nuclear hormone receptor function" (title of the BMS Salvati reference). The synthetic route using 3-(trifluoromethyl)pyridine was suggested by BMS Salvati's description of the synthesis of the 763E compound. | (Ruggio Decl., **Ex. 51**, BMS Salvati et al., US Patent Application Publication dated April 22, 2004);

(Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., at 24:16-25:4);

Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507");

(Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks."). |
| Dr. Chen further testified that be discussed the BMS patent application publication with Dr. Ouk during the early October 2004 lunch table meeting at the "bomb shelter" at UCLA. | |
| 30. "45.  Dr. Ouk and Dr. Jung worked together to conceive the synthesis route of A51." (Def's SUF, at ¶ 45). | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 81:17-83:6); |
| In fact, there is *no* documentary evidence of Dr. Jung's contribution to any synthesis scheme for A51.  Defendants cited to deposition testimony only.  Dr. Jung does not have a laboratory notebook, and does not have *any* document | (Ruggio Decl., **Ex. 51**, BMS Salvati et al., US Patent Application Publication dated April 22, 2004); |

25

| | |
|---|---|
| demonstrating what, if anything, he contributed to the synthesis route of A51. | (Ruggio Decl., **Ex. 10**, 10-13-2004 Email from Ouk to Chen re: A51 ingredient); |
| As Dr. Chen testified, he discussed the BMS patent application publication with Dr. Ouk in early October 2004, which describes a key precursor for A-series compound synthesis, 2-cyano-5-nitro-3-trifluoromethylpyridine, and a synthesis route for this compound.  Before Dr. Ouk attempted to start synthesizing A51, he requested Dr. Chen purchase the 3-(trifluoromethyl)pyridine ingredient. | (Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep Tr., at 131:1-132:1); <br><br> (Ruggio Decl., **Ex. 6**, Ouk LNB No. 4, at UC-CVJ00000562-615); |
| Dr. Jung, however, testified in January of 2019 that Dr. Ouk tried "a few reactions" but then "he tried it again and it didn't work and he tried it again and it didn't work."  Dr. Jung further testified that only "then" they talked and came up with a different synthesis route.  However, the ingredient Dr. Chen was asked to purchase on Oct. 13, 2004, before any synthesis began, was used in the eventual successful synthesis route for A51, contradicting Dr. Jung's testimony that the successful synthesis route was thought of and worked out by both he and Dr. Ouk *after* Dr. Ouk had tried and failed a few times with an alternative route. | (Ruggio Decl., **Ex. 12**, Ouk LNB No. 5, at UC-CVJ00000722 (starting with 3-trifluoromethylpyridine on 1-13-2005; UC-CVJ00000732-3, synthesized A51 on 1-19-2005); <br><br> (Ruggio Decl., **Ex. 18**, 10-27-2005 Dr. Ouk First Letter); |
| Dr. Ouk wrote in his October 27, 2005 letter clearly and unambiguously stated: "You can discuss with Pr. Jung.  He didn't know about A51 yet.  This A51 is not the same as the original class of compound that we just patent." | (Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Dr. Ouk to Dr. Sawyers); |
| In Dr. Ouk's responsive email to Dr. Sawyers on November 5, 2005, where Dr. Ouk emailed Dr. Sawyers a *revised,* undated, and unsigned version of his letter, Dr. Ouk reiterated that "I will e-mail Prof Jung to let him know about the existing [sic] of A51. So you can talk to him." According to Dr. Ouk at this time, Dr. Jung was completely unaware of A51's existence, let alone that Dr. Ouk was | (Ruggio Decl., **Ex. 54**, 3-14-2006 Email from Jung to Ouk re: "Help!!!" stating "We are having terrible troubles getting *your* synthesis of A51 to work, both the nitration and the final coupling.") (emphasis |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| working on its synthesis. | added)). |
| Furthermore, after Dr. Ouk left UCLA, Dr. Jung could not synthesize A51 and A52, even with the assistance of another Ph.D.-level synthetic chemist. Dr. Jung had to ask Dr. Ouk for help to make the synthesis route work.  In an email to Dr. Ouk asking for help, Dr. Jung referred to the synthesis route as "your synthesis." | |
| Therefore, the testimony from Dr. Jung and Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time. | |
| 31. "46.  The synthesis of A51 was difficult.  Dr. Jung assisted Dr. Ouk in overcoming various challenges in designing a synthetic route for A51." (Def's SUF, at ¶ 46). | |
| *See* Plaintiff's response above in ¶ 30 and the evidentiary support therefor, which are incorporated by reference herein. | |
| Therefore, the testimony from Dr. Jung and Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time. | |
| 32. "49. Dr. Ouk testified that he cannot confirm that Dr. Chen actually tested A51." (Def's SUF, at ¶ 49). | (Ruggio Decl., **Ex. 15, 16** "CC1" showing similar activity as "RD37"); |
| In fact, Dr. Ouk was aware that Dr. Chen tested in February of 2005 the chemical compound that Dr. Ouk did not name, but was later known as A51, and that the testing showed that the compound had good activity.  This was information he learned from Dr. Chen. | (Ruggio Decl., **Ex. 17**, 6-22-2005 Email from Ouk to Hung discussing "new compound" that "was testing" with "encouraging activity"); |

| | |
|---|---|
| On June 22, 2005, Dr. Ouk emailed David Hung (the CEO of Medivation) about "an original (patentable) scaffold" that "*was tested*." (emphasis added). Further, Dr. Ouk stated "[t]he design of this molecule was inspired by RD series but we propose new chemical identity (thus widely patentable). *Only one compound* representing this scaffold was made. *Its activity is encouraging*." (emphasis added). Dr. Ouk had not given the compound its "A51" name; the compound was unnamed in Dr. Ouk's June 22, 2005 email. However, Dr. Ouk was actually referring to A51 in this communication, which discredits and disproves his sworn testimony that he was unaware that A51 was tested or had good biological activity.<br><br>In Dr. Ouk's first October 27, 2005 letter, he unambiguously stated that "The biological data of A51 *had been tested*…" Further, Dr. Ouk lied about the conversation that he had with Dr. Chen after Dr. Chen tested A51. Dr. Chen testified that he told Dr. Ouk the activity of the unnamed compound (i.e. A51) was good, the same as RD37. Dr. Ouk's June 22, 2005 email to David Hung corroborates Dr. Chen's testimony.<br><br><u>Therefore, the testimony from Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time.</u> | (Bihovsky Decl., at ¶¶ 75-77);<br><br>(Ruggio Decl., **Ex. 18**, 10-27-2005, Ouk's First Letter);<br><br>(Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep. Tr., at 55:5-7, 55:14-20, 57:7-58:3, 59:20-60:6);<br><br>(Ruggio Decl., **Ex. 59**, 2-14-2014 Email from Sawyers to Loughran and Jung re: Inventorship discussion on A series). |
| 33.  "50.  If Dr. Chen tested A51, the test he used consisted of an assay using publicly known cell line, which was disclosed in a *Nature Medicine* article, published on December 21, 2003, prior to De. Chen's use of the assay to test A51." (Def's SUF, at ¶ 50).<br><br>In fact, Dr. Chen used three different assays to test A51 in February of 2005.  Dr. Chen testified that | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 191:23-193:15, 194:10-22, 196:18-22); |

28

PLAINTIFF'S STATEMENT OF CONTESTED FACT

the assays were not publicly known, for example the details of the "engineered" cell lines used, the androgen receptor or AR "vehicle" used to make the cell lines, the dose of androgen to use in the assays, and the concentrations of the AR-blocking compounds being tested, were not known, published, standardized or routine.  Dr. Chen testified that the cell lines he used for testing A51 were different from the cell lines described in his 2004 Nature Medicine paper.

Mr. Christopher Tran's Dec. 14, 2018 deposition testimony corroborates Dr. Chen's testimony.  Mr. Tran discussed the various parameters (cell lines, AR activation, doses of test compounds to use) that are important for a successful PSA assay.  When asked what his contribution to the A51/A52 invention was, Mr. Tran explained that he made "a cell line like that" for assays and tweaked the PSA assay protocol to shorten the time required to complete an assay, confirming that the bioactivity assays used by the UCLA group in 2005 on both the RD series compounds and A series involved non-public, non-standard, and innovative assay procedures.

On the other hand, Dr. Sawyers offered himself as an expert witness on these assays, but did not know whether the cell lines used by Dr. Chen in February 2005 and those described in previous publications were the same.  Nor did he know the details of the growth conditions of the cells used, the differences in growth media, the passage history of the cells, the plasmids Dr. Chen used for the luciferase assays, and other assay conditions.

Furthermore, Dr. Sawyers admitted that the combination of using R1881 and an AR antagonist as Dr. Chen had used in February 2005, and in particular the concentration range Dr. Chen used

(Ruggio Decl., **Ex. 18**, 12/14/2018 Tran Dep. Tr., at 27:18-33:19, at 28:11-29:2; 30:1-14);

(Ruggio Decl., **Ex. 44**, 1/12/2019 Sawyers Dep Tr., at 99:15-24, 100:14-101:1, 120:23-121:2, 138:8-139:9, 139:17-140:1, 140:7-18, 150:15-151:20, 152:23-153:11, 155:3-156:4, 160:21-161:19, 167:9-21, 169:19-24, 171:18-22, 173:20-23, 177:19-23, 182:21-183:3, 185:20-186:19, 189:17-20, 196:14-197:9, 198:7-12).

| | |
|---|---|
| for his testing, was not disclosed in the prior art. | |
| 34. "53. The test results provided by Dr. Chen in his Complaint show test results for a compound labeled 'CC1,' not A51 or a description of a chemical structure." (Def's SUF, at ¶ 53).<br><br>In fact, Dr. Chen testified that the compound was given a "CC1" designation because Dr. Ouk, the person who synthesized it, did not give it a name back in February of 2005. Dr. Ouk testified that he gave the compound later known as A51 to Dr. Chen for testing.<br><br>Dr. Chen testified that A51's biological activities were similar to those of RD37. The "CC1" results showed good activity, similar to those of RD37.<br><br>Furthermore, as of June 22, 2005, Dr. Ouk had knowledge of the "encouraging" activity of a "new scaffold" compound which could only be A51. Dr. Ouk could have obtained such information only from Dr. Chen. | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 55:5-7, 55:14-20, 57:7-58:3, 59:20-60:6, 245:3-13, 247:8-13);<br><br>(Ruggio Decl., **Ex. 15, 16** "CC1" showing similar activity as "RD37");<br><br>(Ruggio Decl., **Ex. 17**, 6-22-2005 Email from Ouk to Hung discussing "only one" "new compound" that "was tested" with "encouraging activity");<br><br>(Ruggio Decl., **Ex. 18**, 10-27-2005 Ouk's First Letter, "which was now named A51.");<br><br>(Ruggio Decl., **Ex. 59**, 2-14-2014 Email from Sawyers to Loughran and Jung re: Inventorship discussion on A series, "Charlie may be able to produce evidence that he tested A51 in culture (otherwise, where would Samedy have gotten the data?)."). |
| 35. "54. No one can corroborate that CC1 is in fact A51." (Def's SUF, at ¶ 54).<br><br>In fact, Dr. Ouk testified that he gave the compound later known as A51 to Dr. Chen for | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep Tr., at 55:5-7, 55:14-20, 57:7-58:3, 59:20-60:6, 245:3-13, 247:8-13); |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| testing, shortly before the February 15, 2005 date shown on the document showing the testing results for "CC1" and a number or RD-numbered compounds.<br><br>As of June 22, 2005, Dr. Ouk had knowledge of the "encouraging" activity of a "new scaffold" compound which could only be A51.  Dr. Ouk could have obtained such information only from Dr. Chen.<br><br>Dr. Chen testified that A51's biological activities were similar to those of RD37.  The "CC1" results showed good activity, similar to those of RD37. | (Ruggio Decl., **Ex. 15, 16** "CC1" showing similar activity as "RD37");<br><br>(Ruggio Decl., **Ex. 17**, 6-22-2005 Email from Ouk to Hung);<br><br>(Bihovsky Decl., at ¶¶ 75-77). |
| 36.  "56.  Dr. Bihovsky admitted that there is no reference to A51 on the assay results attached by Dr. Chen to his Complaint." (Def's SUF, at ¶ 56).<br><br>In fact, Dr. Bihovsky undertook a detailed analysis of all the available documents, including the laboratory notebooks of Dr. Ouk and Dr. Chen, and opined that, not only did Dr. Chen test A51 in early 2005 and obtained results showing good activity, but he also effectively communicated the results to Dr. Ouk.  As of June 22, 2005, Dr. Ouk was discussing with David Hung of Medivation through emails Dr. Ouk's knowledge of the "encouraging" activity of a "new scaffold" compound which could only be A51.  Dr. Ouk could have obtained such information only from Dr. Chen. | (Ruggio Decl., **Ex. 17**, 6-22-2005 Email from Ouk to Hung discussing "new scaffold compound" that "was tested" and showed "encouraging activity");<br><br>(Bihovsky Decl., at ¶¶ 75-77). |
| 37.  "59.  Dr. Chen admits that he did not show the test results for a compound labeled 'CC1' to any other person at UCLA during the year 2005." (Def's SUF, at ¶ 59).<br><br>In fact, Dr. Chen testified that he conveyed the testing results on the unnamed compound (later known as A51) to Dr. Ouk at the "bomb shelter" lunch place shortly after the testing was done.  He | (Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep. Tr., at 57:7-58:3, 59:20-60:6, 244:19-245:2);<br><br>(Ruggio Decl., **Ex. 17**, 6-22-2005 Email from Ouk to Hung discussing "new scaffold compound" that |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| did not bring the printout bearing the designation "CC1" to the meeting with Dr. Ouk.  The testing results on CC1, i.e. A51, were effectively communicated to Dr. Ouk, because on June 22, 2005, Dr. Ouk discussed with David Hung of Medivation through emails Dr. Ouk's knowledge of the "encouraging" activity of a "new scaffold" compound which could only be A51.  Dr. Ouk could have obtained such information only from Dr. Chen. | "was tested" and had "encouraging activity"); <br><br>(Bihovsky Decl., at ¶¶ 75-77). |
| 38.  "60.  Believing that A51 was an inactive compound, there was no further development of this series of compounds for a period of time." (Def.'s SUF, at ¶ 60). <br><br>This Statement lacks a subject as to "believing." <br><br>In fact, other than Dr. Chen, at least Dr. Ouk knew by June 22, 2005 that A51 was an *active* compound.  Dr. Ouk appreciated the good activity of this "new scaffold" compound, and tried to interest Dr. David Hung of Medivation with it. Medivation was at the time negotiating with UCLA on a license that could potentially cover A51 or other A-series compounds.  In late September, 2005, Dr. Ouk had a conversation with Dr. Hung and discussed information relating to Dr. Chen, which Dr. Hung found "interesting."  Dr. Ouk concealed his knowledge of A51's good testing results from the others at UCLA, until late October of 2005, when Medivation did not hire him, and shortly before he left UCLA to work at Valeant, where he could not work on A-series compounds. <br><br>Dr. Ouk testified that Dr. Jung played no role in the conception of the A-series compounds.  He wrote in late October and early November of 2005 indicating that Dr. Jung had no knowledge of the "existing" of A51.  According to these 2005 writings by Dr. Ouk, Dr. Jung could not have | (Ruggio Decl., **Ex. 17**, 6-22-2005 Email from Ouk to Hung discussing "new scaffold compound" with "encouraging activity"); <br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., at 234:11-16, 234:21-24); <br><br>(Ruggio Decl., **Ex. 54**, 9-30-2005 Email from Hung to Sawyers re: "an interesting talk with Samedy regarding Charlie Chen and some data that I discovered in the massive data review I conducted yesterday"); <br><br>(Ruggio Decl., **Ex. 18**, 10-27-2005 Ouk First Letter); <br><br>(Ruggio Decl., **Ex. 48**, 11-6-2005 Email from Ouk to Sawyers, "I will e-mail Prof Jung to let him know about the existing of A51. So you can talk to him."); |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| known that A51 had been tested, or any testing results had been obtained.  Dr. Jung cannot credibly claim now that he "believed that A51 was an inactive compound" before late October, 2005.<br><br>Therefore, the testimony from Dr. Jung or Dr. Ouk offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time. | (Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., at 186:22-24);<br><br>(Ruggio Decl., **Ex. 49**, 8-23-2013 Email from Ouk to Wongvipat, "Jung is clearly not inventor"). |
| 39.  "61.  Dr. Chen admits that he had no involvement with the A-series compounds at UCLA after his alleged February 2005 tests or had any involvement in administering the drug into living organisms, determining particular dosages or drug concentrations, determining particular routes of drug administration, or any other work regarding the A-series compounds or their application." (Def's SUF, at ¶ 61).<br><br>In fact, Dr. Chen had developed bioactivity assays that were continued to be used after February 2005 to screen for suitable RD-series compounds as starting points for combining with pyridine structure on the left-hand side, to form A-series compounds.  Dr. Chen personally tested RD162, and determined that it had good activity as well as good PK properties.  He told both Dr. Jung and Dr. Sawyers that RD162 could be "the best of this series," which meant that, based on the set course of identifying RD compounds and modifying them with a pyridine structure, A52 can be made, and A52 should have good bioactivity and PK properties, similar to RD162, and can be administered similarly to "living organisms," animals, or human patients. | (Ruggio Decl., **Ex. 22**, 7-30-2005 Email from Sawyers to Jung: "Yesterday Charlie told me the same thing about RD-162");<br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., at 218:18-219:23, 220:10-23);<br><br>(Ruggio Decl., **Ex. 18**, 10-27-2005 Ouk First Letter);<br><br>(Ruggio Decl., **Ex. 3**, Chen LNB No. 3, at UC-CVJ00006506-25). |
| 40.  "65.  Dr. Ouk testified that he did not discuss the A52 molecule with Dr. Chen and that Dr. Chen had no involvement in the conception of the A52 | (Ruggio Decl., **Ex. 18**, 10-27-2005 Ouk First Letter); |

| | |
|---|---|
| compound." (Def's SUF, at ¶ 65).<br><br>To the extent "conception" is a legal concept, Dr. Ouk was not competent to give a legal conclusion.<br><br>In fact, Dr. Ouk explained the "conception" process for A52 in his October 27, 2005 version of his "A51 story." First, RD162 was tested and found to "have a tremendous effect on tumor in vivo." Second, "if A51 turned [out] to be as active as RD37 . . . there is a big chance that by combining the idea [of] A51 and RD162, one could easily make a compound that would be as good as RD162 . . . ." He then drew the structure of A52.<br><br>Dr. Chen tested RD162, and his testing and conclusion that RD162 showed good activity and PK properties directly led to the in vivo testing of the compound. Dr. Chen also told Dr. Ouk that A51 was as good as RD37. The combination of pyridine ("the idea of A51") and the right-side half of RD162 is "easily made" at this point.<br><br>Dr. Jung testified that, "we already knew that 162 now was quite good, it would be natural to take the left-hand pyridine piece and put it with 162." | (Ruggio Decl., **Ex. 3**, Chen LNB No. 3, at UC-CVJ00006506-25);<br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., at 259:23-260:4);<br><br>(Ruggio Decl., **Ex. 22**, 7-30-2005 Email from Sawyers to Jung: "Yesterday Charlie told me the same thing about RD-162"). |
| 41. "70. Dr. Jung, Dr. Sawyers, Dr. Ouk, Dr. Tran, and Dr. Wongvipat are the named inventors on all three patents." (Def's SUF, at ¶ 70).<br><br>In fact, Mr. Christopher Tran and Mr. John Wongvipat were not doctoral degree recipients, at least at the time of the invention that led to the patents-in-suit. In 2004 and 2005, Mr. Tran worked as a lab technician. Mr. Wongvipat had the title of a "lab manager," and did technician-type scientific work as well as carried out administrative duties. | (Ruggio Decl., **Ex. 32**, 12/14/2018 Tran Dep. Tr., at 8:24-9:3);<br><br>(Ruggio Decl., **Ex. 45**, 12/20/2018 Wongvipat Dep. Tr., at 6-20). |
| 42. "74. Dr. Ouk testified that he does not agree | (Ruggio Decl., **Ex. 56**, 11- |

with the content of or recall reviewing the content of a November 11, 2013 letter from Dr. Chen's attorney to UCLA claiming that Dr. Chen is an inventor of A51." (Def's SUF, at ¶ 74).

In fact, the attorney, R. Rao, represented both Dr. Ouk and Dr. Chen at the time. On November 7, 2013, Dr. Rao emailed both Dr. Chen and Dr. Ouk a draft copy of the November 11, 2013 letter. The subject line for this email was "*Draft Memo on Inventorship for A51/A52 Patents.*" (emphasis added). Dr. Rao asked Dr. Ouk if "you have any comments or questions? If you would like to discuss the memo on the phone, please let me know." Dr. Ouk responded with "Hi Weisun, It's fine with me. Thanks. Samedy."

Further, the letter was attached to a November 13, 2013 email from Dr. Chen to a Ropes & Gray attorney representing Johnson & Johnson at the time. Both Dr. Rao and Dr. Ouk were copied on the email. Dr. Ouk testified in November of *2018* that he retained Dr. Rao to dispute royalty shares for the RD-series compound patents, and not for the inventorship on the A-series compound patents, and that he did not read the 2013 Rao letter. However, the Subject line of the Chen email, on which Dr. Ouk was copied, clearly states the email was regarding "Aragon asset, US patent 8,445,507 Inventorship." The attachment to the email was named "Letter to Rita Hao re Inventorship for the '507 Patent.pdf." The '507 patent is one of the patents in this case that cover the A-series compounds and their use. Furthermore, the body of this email discusses the dispute on the inventorship on the '507 patent, stating, "Dr. Samedy and I have hired a lawyer to investigate the inventorship of that patent . . . ."

Therefore, the testimony from Dr. Ouk offered in

7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks. Samedy")

(Ruggio Decl., **Ex. 8**, 11-13-2013 Email from Chen to J&J's Attorney, with Rao and Ouk copied, subject "Aragon asset, US Patent 8,445,507 Inventorship);

| | |
|---|---|
| support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time. | |
| 43. "75.  Dr. Chen is a biologist." (Def's SUF, at ¶ 75).<br><br>*See* Plaintiff's response above in ¶ 3 and the evidentiary support therefor, which are incorporated by reference herein.  Dr. Chen had and has a Ph.D. in biochemistry. | |
| 44. "76.  The A-series and RD-series are patentably distinct scaffolds—the USPTO has issued patents for both series of compounds." (Def's SUF, at ¶ 76).<br><br>Whether the compounds are "patentably distinct" is a legal conclusion.  Defendants cite only to Dr. Winkler's opinions for support, but Dr. Winkler has not been offered as an expert on patent law, and is not competent to opine on the patentability of compounds.  The patentability of the RD-series compounds or A-series compounds has not been adjudicated or otherwise decided by any tribunal. | |
| 45. "79.  The A-series compounds have different biological properties than the RD-series compounds, due to their different chemical structures." (Def's SUF, at ¶ 79).<br><br>In fact, according to Dr. Jung's recent testimony, the "precise structure" for the androgen receptor when a ligand binds to it "is extremely difficult to figure out."  Furthermore, when asked if the biologists knew how compounds fit into the binding pocket of AR, Dr. Jung answered, "none of us knew how it fit in exactly.  We were making guesses all the way along."  Further, "even today, all we have are modeling.  We don't have any crystal structures of any of our compounds, the RD series bound to the AR." | (Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., at 42:7-17, 118:9-18);<br><br>(Ruggio Decl., **Ex. 44**, 1/12/2019 Sawyers Dep. Tr., at 37:22-38:3). |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| Defendants cite to Dr. Sawyers' deposition testimony only for support of Statement ¶ 79. Dr. Sawyers is a medical doctor, and not a chemist. | |
| 46. "80. Dr. Chen did not have unique knowledge regarding the activity of any particular RD-series compounds, as of the August 2004 meeting." (Def's SUF, at ¶ 80).<br><br>In fact, Dr. Chen developed the bioactivity assays for RD-series compounds, and conducted testing on the compounds. Dr. Sawyers did not, and still does not, know the details of the testing Dr. Chen developed and conducted. As the project leader, Dr. Chen disclosed some of the information he gained from his testing at meetings with the Sawyers lab, or at lunch meetings with Dr. Ouk. Dr. Jung acknowledged that, without the insights and testing done by Dr. Chen and Dr. Sawyers, the project would have gone "nowhere." | (Ruggio Decl., **Ex. 32**, 12/14/2018 Tran Dep. Tr., at 48:1-11, 49:1-3,<br><br>(Ruggio Decl., **Ex. 29**, 11/13/2018 Ouk Dep. Tr., at 106:24-107:23);<br><br>(Ruggio Decl., **Ex. 30**, 12/12/2018 Chen Dep. Tr., at 244:19-245:2);<br><br>(Ruggio Decl., **Ex. 55**, 10-16-2007 Email from Jung to Sawyers);<br><br>(Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., at 62:25-63:4, 63:20-64:1, 64:11-65:2);<br><br>(Ruggio Decl., **Ex. 1, 2, 3**). |
| 47. "81. Dr. Jung testified that, regardless of Dr. Chen's earlier work on the RD-series, the chemists, Dr. Ouk and he, would have independently chosen to make the pyridine ring substitution to RD37 and RD162, and had chosen RD37 simply because they had made it earlier." (Def's SUF, at ¶ 81).<br><br>What certain chemists "would have" done appears to be expert testimony irrelevant to the issue of inventorship, which deals with what was actually done, and by whom. Dr. Jung has not been offered to testify as an expert witness in the case, and has not rendered any expert reports. | (Ruggio Decl., **Ex. 18**, 10-27-2005 Ouk's First Letter);<br><br>(Ruggio Decl., **Ex. 48**, 11-6-2005 Email Ouk to Sawyers);<br><br>(Ruggio Decl., **Ex. 57**, 11-14-2005 Email from Jung to Ouk "I have made several minor corrections to your letter."); |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| In fact, there is no corroborating document that supports this statement by Defendants.  In Dr. Ouk's first version of the "A51 story" letter, dated October 27, 2005, he stated: "You can discuss with Pr. Jung. He didn't know about A51 yet.  This A51 is not the same as the class of the original compound that we just patent."  This contradicts Defendants' Statement ¶ 81 that Dr. Jung participated in the "choice" of RD37 as a starting compound to make pyridine substitution. | (Ruggio Decl., **Ex. 5**, 11-15-2005 Ouk Final Letter); |
| In Dr. Ouk's responsive email to Dr. Sawyers on November 6, 2005, Dr. Ouk reiterated that "I will e-mail Prof Jung to let him know about the existing [sic] of A51. So you can talk to him."  This statement, made in November of 2005, clearly demonstrates that Dr. Jung was **unaware** of A51 when it was synthesized and tested.  This statement disappeared in the finalized November 15, 2005 version of the letter after Dr. Jung edited the draft. | (Ruggio Decl., **Ex. 27**, 5/14/2012 Ouk Dep Tr., 186:22-24 (asked if Dr. Jung designed "the A series scaffold" and Dr. Ouk responded "No, especially not."); |
| Further, during Dr. Ouk's 2012 deposition in the *Medivation* litigation, he was asked if Dr. Jung helped design the "A-series" to which Dr. Ouk answered: "No, especially not." | (Ruggio Decl., **Ex. 49**, 8-23-2013 Email from Dr. Ouk to Mr. Wongvipat, "Jung is clearly not inventor … He doesn't want to wake up that monster."); |
| Furthermore, in 2013, at the joint request of Dr. Ouk and Dr. Chen, their attorney sent the Regents a letter stating that "Dr. Ouk and Dr. Chen have both confirmed that they two together conceived the structure of A51 in early October 2004 on the lunch table at the "bomb shelter" (a lunch area) at UCLA and surmised that, like the compounds of the RD series licensed to Medivation, the compound A51 may be used to treat prostate cancer."  The letter further stated that "Dr. Ouk and Dr. Chen have both indicated that Dr. Michael Jung did not contribute to the invention of the '507 patent and should be removed from the list of | (Ruggio Decl., **Ex. 7**, 11-13-2013 Rao Letter re: A51 and "U.S. Patent No. 8,445,507"); (Ruggio Decl., **Ex. 56**, 11-7-2013 Email from Ouk to Rao, Chen, "Hi Weisun, It's fine with me. Thanks.") |

| | |
|---|---|
| inventors." "Dr. Michael Jung did not conceive A51 and A52, nor did Dr. Michael Jung design or synthesize A51 and A52 or test their biological activities." <br><br> <u>Therefore, the testimony from Dr. Jung offered in support of this "fact" is not reliable in light of the contradictory documents and statements made closer to the relevant period of time.</u> | |
| 48. "82. Dr. Sawyers testified that, regardless of Dr. Chen's earlier work on the RD-series, the pyridine ring substitution would have been invented and that prior work on the RD series was not necessary to invention of the A-series, but rather merely accelerated the process." (Def's SUF, at ¶ 82). <br><br> The questions of what certain scientists "would have" invented, and with what speed in the presence or absence of "prior work," both appear to call for expert testimony irrelevant to the issue of inventorship, which deals with what was actually done, and by whom. Dr. Sawyers is a medical doctor, and has offered himself as an expert to testify on the narrow topic of the testing methodology used by Dr. Chen in February of 2005, but he has not offered to opine on what "would have been invented" by hypothetical persons, and with what speed, under an alternative set of facts, and has not rendered any expert reports in this regard. <br><br> In fact, there is no support for Defendants' Statement ¶ 82 above. Dr. Jung acknowledged in 2008 that the chemists on the team would be "nowhere" without the "testing and insight" including those from Professor Chen. <br><br> In Dr. Ouk's November 15, 2005 "A51 story" letter, which Dr. Jung admitted to editing, Dr. Ouk | (Ruggio Decl., **Ex. 55**, 10-16-2007 Email from Jung to Sawyers); <br><br> (Ruggio Decl., **Ex. 36**, 1/4/2019 Jung Dep. Tr., at 62:25-63:4, 63:20-64:1, 64:11-65:2); <br><br> (Ruggio Decl., **Ex. 57**, 11-14-2005 Email from Jung to Ouk "I have made several minor corrections to your letter."); <br><br> (Ruggio Decl., **Ex. 5**, 11-15-2005 Ouk Final Letter). |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

<table>
<tr><td>
told the story of how Dr. Chen refused to give him the biological activity testing data on A51 in February, 2005, and, as a consequence, "[f]rom February to October 2005, our A51 project was on hold" because he "did not have the data on its biological activity." (UC-CVJ00000142). Furthermore, Dr. Ouk wrote in the same 2005 letter, "I *urgently needed our new compounds be tested*." (UC-CVJ00000141) (emphasis added). These statements completely contradict Defendants' Statement above that the invention of the A-series compounds would be inevitable without Dr. Chen's assays and testing.
</td><td></td></tr>
</table>

## II.    RESPONSE TO CONCLUSIONS OF LAW

| DEFENDANTS' CONCLUSION | RESPONSE |
|---|---|
| 1. After a patent has been issued, a presumption attaches that the named inventors are the true and only inventors. | 35 U.S.C. § 256 further provides a statutory mechanism to correct inventorship. |
| 2. A party that seeks to be added as an inventor has a heavy burden and must show that he is an inventor by clear and convincing evidence. | The burden is simply "clear and convincing evidence." |
| 3. "Clear and convincing" is "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" | No response |
| 4. To qualify as a joint inventor under 35 U.S.C. § 116(a), a joint inventor must "(1) contribute in | *Pannu* is quoted correctly; however, in Defendants' brief they consistently leave out the "or reduction to practice" aspect of |

| | |
|---|---|
| some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." | inventorship from *Pannu*, and improperly focus solely on an overly narrow definition of conception.<br><br>Further, though *Pannu* states that a contribution is measured against the dimension of the full invention, because 35 U.S.C. § 116 states "Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent," it follows that contribution to a subset of claims or even a single claim is sufficient for inventorship. *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). |
| 5. Joint inventorship is measured against the content of a patent's claims, not the content of the specification. | Correct, with the caveat that even a single claim is sufficient for inventorship on the entire patent. *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). |
| 6. Conception is the touchstone of inventorship, and is the formation in the mind of the inventor, a definite and permanent idea of the complete and operative invention. | There is no requirement that the formation of a "definite and permanent idea of the complete and operative invention" must begin, end, and occur completely within a single person's mind, or that the conception of the invention and the way to make the invention, which can be part of the legal definition of "conception," must be achieved by the same person. |
| 7. An alleged co-inventor must demonstrate by clear and convincing evidence, through independent corroborating evidence, that he contributed to the conception of the inventions. | Per *Pannu*, as noted above, contribution to the reduction to practice can suffice. |
| 8. "Reliable corroboration | No response |

| | |
|---|---|
| preferably comes in the form of records made contemporaneously with the inventive process." In addition, circumstantial evidence of an independent nature or oral testimony from someone other than the alleged inventor may corroborate a putative inventor's claim. | |
| 9. A putative inventor's testimony "cannot, standing alone, rise to the level of clear and convincing proof." | No response |
| 10. "The mere fact that the [court] found the alleged inventor's testimony to be more credible than the named inventor does not itself rise to the level of clear and convincing evidence." | Correct, but credibility assessments are also improper on summary judgment, and for the purposes of this motion, the alleged inventor's testimony must be accepted as true in conjunction with the documentary evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). |
| 11. An "alleged joint inventor seeking to be listed on a patent must demonstrate that his labors were conjoined with the efforts of the named inventors. Joint inventorship under section 116 can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts." | No response |
| 12. The conception of a chemical substance or compound "includes knowledge of both the specific chemical structure of the compound and an operative method of making it." | Although Defendants try to spin it otherwise, there is no requirement that the structure and the method of making both be conceived or known by the same person or even at the same time. For instance, in *Falana v. Kent State Univ.*, 669 F.3d 1349 (Fed. Cir. 2012), someone who had developed a synthesis |

| | protocol for a genus of compounds was still an inventor as to new species that were synthesized after the protocol developer left the University and was no longer working with the other inventors.<br><br>Furthermore, in addition to structure and a method of making the compound, a demonstration of usefulness is required for a compound to be patentable. |
|---|---|
| 13. The conception of the structure requires "'a firm and definite idea' of the claimed combination as a whole." | Again, there is no requirement that this be in one individual's mind, and joint inventors are expressly contemplated by the patent statute. 35 U.S.C. § 116. |
| 14. The conception of an operative method of making a chemical compound occurs when there is an "'operable route' or method of synthesizing" the compound. | No response |
| 15. The conception of a pharmaceutical composition is complete "when one knows of its specific chemical structure, has a method for making it, and appreciates that it has a utility." | Again, there is no requirement that this be in one individual's mind, and joint inventors are expressly contemplated by the patent statute. 35 U.S.C. § 116. |
| 16. Conception of a pharmaceutical composition may occur prior to any testing, where the inventors conceive of a chemical structure or formula, and all that was required was to perform testing to determine which compound would provide the necessary activity, and thereby be developed into a marketable drug. | This case notably states *may* occur rather than that conception *does* occur prior to testing; *Pannu* expressly contemplates that there are also cases where reduction to practice is part of the inventive contribution. Where, as here, testing is not routine (and in regard to A52, testing took place *before* the making of the compound and led directly to it), it is part of the inventive activity. |
| 17. Conception of a method of treatment is complete when the | Again, reduction to practice can also be an inventive contribution per *Pannu*. |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

| | |
|---|---|
| inventors "had thought of the particular [compound at issue] with which they intended to address the problem" and formulated the idea of the "intended use of [compound at issue] to treat [the disorder]" and "all that remained was to reduce it to practice – to confirm its operability and bring it to market." | |
| 18. Subsequent testing of such a compound is "simply confirming the operability" of the compound and was not conception of the method of treatment, as the true inventors already "had a definite and permanent idea of the operative inventions." | (1) Testing can be an inventive contribution particularly where the testing is not known or routine; (2) Prior testing that led directly to the invention is also an inventive contribution left open by Defendants' case here. |
| 19. "An inventor need not know that his invention will work for conception to be complete… He need only show that he had the idea; the discovery that an invention actually works is part of its reduction to practice." | Again, reduction to practice can also be an inventive contribution per *Pannu*. |
| 20. Running a test that confirms that the compounds worked, where the compounds had already been created, and the named inventors had a clear idea of the form of the compounds prior to testing, is not conception but reduction to practice. | Again, reduction to practice can also be an inventive contribution per *Pannu*. While routine reduction to practice may not qualify as inventive, non-routine, non-public developments can be. |
| 21. Merely conducting a test that is publicly known is not inventive as a matter of law, as "suggestions of known protocols or known test methods by others does not lead to an inference that the contributor is | Use of non-public protocols and methods can be inventive contribution. |

| | |
|---|---|
| a co-inventor." | |
| 22. Merely assisting the actual inventor does not quality one as a joint inventor. | However, going beyond mere assistance can do so. |
| 23. An inventor "may use the services, ideas and aids of others in the process of perfecting his invention without losing his right to a patent." | While that inventor does not lose his right, others may make an inventive contribution such that they are also inventors. 35 U.S.C. § 116; *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) |
| 24. Where inventors create part of a molecule but there is no evidence that the inventor created a combination of that part with other groups to make up the claimed compound, the inventor of the first part of the molecule is not a coinventor. | Incorrect paraphrasing of *Am. Bioscience*. Furthermore, it is inapposite; there, those found not to be inventors (the FSU scientists) developed different compounds in parallel from those at ABI, and the new compound was developed separately, at ABI, from the purported inventors at FSU (whose contributions were also determined to be simply well-known principles), whereas here the identification of the compounds by Dr. Chen is part and parcel of the conception of the invention, and was done with Dr. Chen as a core part of the team for which all three other members have been named inventors. |
| 25. Suggestions by others that do not reveal the entire invention and do not contribute to "a firm and definite idea" of the claimed invention as a whole, do not entitle one to be a joint inventor. | Suggestions that led to a combination (such as a compound with multiple parts) covered by a patent claim can be inventive activities. Non-publicly available testing and methods performed can also contribute to a firm and definite idea of the compounds claimed, and their utility. |
| 26. Work of an allegedly omitted inventor who "made it easier for [named inventors] to identify the entire [invention]" is not sufficient to contribute to conception. | Work of an omitted inventor that identified the relevant compounds and also their utility is a contribution to conception. |
| 27. Where, "[a]t best, [the putative inventor] made a contribution that either inspired or informed the | Work of an omitted inventor that identified the relevant compounds and their utility is a contribution to conception. |

| | |
|---|---|
| ultimate invention of [claimed compound]," this is "not sufficient to render him an inventor of the compounds claimed in the patent-in-suit." | |
| 28. Where work of allegedly omitted coinventor "made it easier for [named inventors] to identify the entire [invention]" it was not sufficient to contribute to conception. | Redundant to 26. Work of an omitted inventor that identified the relevant compounds and their utility is a contribution to conception. |
| 29. Finding that the fact that alleged inventors provided antibody that enabled named inventors to make their discovery did not render them inventors, rather only the inventors who developed idea of using the antibodies were the inventors; "'but for' causation is not tantamount to invention." | A tool that merely enabled one to make a discovery is different from contributing to the compound itself, as Dr. Chen did. |
| 30. In the Complaint, "the necessary factual averments are required with respect to each material element of the underlying legal theory.... [S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." | Addressed in Brief. In short, none of the listed cases are applicable and are all factually different. There is no new claim raised for the first time in opposition to summary judgment, as evidenced by the fact that Defendants included it in their own initial summary judgment papers. Defendants certainly were on notice of the theories they seek to preclude, through interrogatory responses and expert reports. |

PLAINTIFF'S STATEMENT OF CONTESTED FACT

1   Dated: January 29, 2019                    /s/ Samuel J. Ruggio

2                                              Samuel J. Ruggio

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28